OPINION OF THE COURT
L. Kingsley Smith, J.
NATURE OF LITIGATION
Within the framework of this litigation are found dual challenges to New York’s method of financing elementary and secondary public school education. Proceeding upon separate but related theories, two groups of plaintiffs each seek a judgment declaring that such method of educational financing violates provisions of the Federal and State Constitutions.
THE ORIGINAL PLAINTIFFS
The group of plaintiffs responsible for instituting the action as it was originally constituted are, for the sake of clarity and convenience, referred to as the "original plaintiffs”. This group is comprised of 27 school districts situated in 13 counties and 12 school children, represented by their parents or guardians, who are students in public elementary or secondary schools operated by seven of the plaintiff school districts.
THE PLAINTIFFS-INTERVENORS
After an action had been instituted by the original plaintiffs, a second group of plaintiffs sought and was granted the right to intervene in that action. That group is referred to as *476 the "plaintiffs-intervenors” and sometimes as the "interveners.” It includes the Boards of Education of the Cities of New York, Rochester, Buffalo and Syracuse; the City of New York itself; certain officials of the so-called "Big Four” cities; the United Parents Associations of New York, Inc.; and 12 school children, represented by their parents or guardians, who are students in public schools operated by the named city school districts. The Board of Education of the City of Buffalo was included as one of the original plaintiffs and thus is a member of both groups of plaintiffs.
THE DEFENDANTS
The defendants are the Commissioner of Education of the State of New York, the University of the State of New York, the Comptroller of the State of New York, and the Commissioner of Taxation and Finance of the State of New York.
THE COMPLAINT OF THE ORIGINAL PLAINTIFFS
The original plaintiffs set forth three causes of action in their complaint. The first cause of action contains allegations delineating facts which are alleged constitute a violation of the equal protection clause of the State Constitution (art I, §11). More particularly, the first cause of action’s essential allegations embrace the matters that follow. New York has created over 700 school districts with power to levy and collect taxes on the real property within district boundaries and to retain such tax revenues to finance public education within each district. Cities with populations exceeding 125,000 have themselves been given similar powers. By decision of the State, local property taxes are the primary source of funds for the support of public elementary and secondary education. The school districts have grossly unequal amounts of real property wealth. Because of this, the application of any given tax rate yields grossly unequal revenues per pupil. Districts poorer in real property wealth, such as the plaintiff districts, levy taxes at substantially higher rates than neighboring districts having greater real property wealth but are unable to match the latter in expenditures per child or in the provision of educational services.
Although the State contributes from its general revenues to supplement local tax revenues, such State aid does not eliminate the gross disparities in the allocation of education re *477 sources caused by the decision to rely chiefly on the local property tax to finance public elementary and secondary education.
The formula contained in the Education Law to supplement locally raised revenues is structurally unable to remedy the disparities caused by the decision to rely chiefly on the local real property tax to finance public education.
Because the State’s schools finance system relies principally on local real property taxes and because the State aid program does not eliminate the disparities produced by such reliance, there have been and will continue to be gross disparities in per pupil expenditures among the districts. Those disparities are a function of the uneven distribution of real property wealth among the school districts.
The disparities in expenditures per pupil resulting from variations in local real property wealth produce substantial differences in what school districts are able to provide for their pupils. Districts that are poorer in real property wealth, such as the plaintiff districts, cannot match the ability of districts with greater real property wealth to offer educational advantages such as: small class size; experienced and effective teachers; low pupil-teacher ratios; curricular breadth; extensive extracurricular programs; modern equipment; and special programs for the disadvantaged or the specially gifted.
By virtue of the foregoing, the original plaintiffs assert in their first cause of action that the State’s method of financing public education "denies to plaintiff students and their parents those educational resources available to students in other, wealthier districts in the State.” Further, that such system prevents the plaintiff districts from carrying out their full responsibilities and obligations to the schools, parents and children and compels them to offer an education inferior to that offered by other districts possessing greater real property wealth.
In the second cause of action facts are described that are alleged to constitute a violation of the education article of the State Constitution (art XI, § 1). The gist of the allegations follows. The education article requires the State to create a State-wide system of free common schools in which all children may be educated. It is alleged that the State has failed to meet that obligation. The method chosen by the State for financing public schools does not create any uniform Statewide system. Rather, it establishes over 700 different school *478 systems with widely differing capacities to provide educational resources to which the State has delegated its own constitutional responsibility to establish and finance public schools where all children of the State may be educated. Because such method compels each district to depend on its own local property wealth as the primary measure of resources available for its children’s education, and because those resources vary greatly from district to district, there is no uniformity in resources available for educational purposes from one district to another.
Noneducational demands upon the local real property tax base, the costs of educational services and the educational needs of particular children or groups of children vary greatly from district to district. These factors serve to exacerbate the inequalities arising from the uneven distribution of real property wealth.
Accordingly, there is no assurance that any two pupils, who are alike except for their place of residence being in different school districts, will be afforded equivalent educational advantages. By accident of greater real property wealth, one district may be able to offer a group of educational features which another district, by the accident of having lesser property wealth, is unable to offer its pupils.
In choosing a school finance system that permits such gross disparities to exist, the State has failed to meet its constitutional obligation to provide a "system” in which "all the children” of the State may be "educated.”
Such a system, it is alleged, also denies to some children, based on the lesser real property wealth of their school districts, the means to participate meaningfully as citizens and to function successfully in the labor market.
In summary, by making the extent to which a child may be educated a function of the real property wealth of the school district in which that child happens to reside, or the school district in which that child’s parents are able to afford to live, the State has violated the democratic and egalitarian intention that underlies the education article, substituting in its stead an impermissible reliance on the accident of real property wealth as the ultimate determinant of the quality of education available to the children in any particular part of the State.
The third cause of action sets forth facts which are then alleged to constitute a violation of the equal protection clause *479 of the Federal Constitution. The essence of these allegations follows.
It is first alleged that the Federal equal protection clause forbids a State to make allocation of educational resources among its school children a function of real property wealth in the school districts where the children happen to reside.
Because the State’s school finance system relies chiefly on revenues generated by local property taxes and because the State’s own basic aid formula is inadequate to compensate for the disparities caused by such reliance, the level of expenditures for any child’s public school education and the consequent quantity and quality of educational services available to him are a function of the real property wealth of the school district in which he lives.
By reason of the foregoing, it is alleged that the State’s financing system violates the Federal equal protection clause. The following statement in the court’s decision on the defendants’ motion for summary judgment rendered April 9, 1976 is pertinent to this cause of action: "That portion of the original plaintiffs’ action which alleges violation of the Equal Protection Clause of the Federal Constitution is not being pressed in the light of the United States Supreme Court decision in San Antonio School District v. Rodriguez, 411 U.S. 1. That claim has not been abandoned but expressly reserved in the event the Supreme Court reconsiders its holding in the last cited case (Plaintiffs’ Memorandum of Law in Opposition to Defendants’ Motion for Summary Judgment, p. 8).”
THE AMENDED COMPLAINT OF THE PLAINTIFFS-INTERVENORS
The amended complaint of the plaintiffs-intervenors sets forth two causes of action. Each cause of action alleges that the State aid statute which provides operating expense aid to school districts violates the equal protection clause and the education clause of the State Constitution and the equal protection clause of the Federal Constitution as well.
In the first cause of action unconstitutionality is predicated upon allegations to the effect that the statute, in undertaking to grant operating expense aid to local districts in proportion to their lack of local taxable resources for financing public education, employs so arbitrary and inadequate a measure of local incapacity that the large urban school districts rendered poorest in school finance resources because of their greater *480 municipal services, burdens and school costs, are treated as wealthy and receive far less State aid than other school districts that have more local resources for providing education to their pupils.
In the second cause of action the plaintiffs-intervenors allege unconstitutionality for the following reason. The aid statute, in undertaking to grant special assistance to school districts for their pupils requiring compensatory schooling services, arbitrarily and inequitably grants less and inadequate aid per pupil in the largest urban districts having the highest concentrations of such pupils and thus the greatest need for compensatory school services with which to provide them learning opportunities.
THE ANSWER OF THE DEFENDANTS
The position of the defendants in opposing the claims of the two groups of plaintiffs is set forth in a single answer organized into a series of 28 defenses, the last of which contains denials and admissions of particular allegations in both complaints. Because certain matters raised by the answer became the subject of defendants’ motion for summary judgment which was determined prior to trial, only the principal topics embraced by the series of defenses that may be regarded as surviving that determination need be summarily described at this point. These include the assertion that legislation relating to State aid is based on rational policy determinations made by the Legislature and therefore constitutes a valid exercise of legislative power. It is also claimed that by the enactment of various provisions of the Education Law, the Legislature has met the constitutional mandate imposed by the education article of the State Constitution.
Other defenses include these assertions:
- The statutes that are the subject of this litigation make no distinction based upon personal wealth.
- Primary and secondary education is not funded principally by taxes on real property.
- The Education Law does not require that an unfair proportion of support for education be borne by the local real property tax.
- The provisions for a minimum flat grant to each school district insure that every district receives some share of the *481 appropriations from general State revenues for its education program.
- The determination of "municipal overburden” and the weight accorded thereto is a question of public policy to be made by the Legislature through the poltical rather than the judicial process.
- The grievances complained of by the two groups of plaintiffs should be addressed to the Legislature for redress rather than to the court.
THE RELIEF SOUGHT
The original plaintiffs seek a judgment declaring that the State’s method for financing public schools violates some or all of the constitutional provisions earlier mentioned. In addition, they ask that the court retain jurisdiction of the action for a reasonable period of time to permit legislative enactment of a new school finance system that is not violative of either constitutional provision. If the Legislature fails within a reasonable time to correct the violations alleged by the original plaintiffs, then the court is asked to issue an injunction against the continuation of the present school finance system.
The plaintiffs-intervenors request a judgment declaring that the school finance system violates the State and Federal constitutional provisions earlier described for the reasons set forth in their complaint. They also seek to have the judgment include a declaration that the Legislature must make corrections in the State operating expense aid formula to overcome the defects that the court is asked to find currently exist. It is also requested that the judgment redirect State funds to school districts on an interim basis if the Legislature fails within a reasonable time to take corrective action. The plaintiffs-intervenors request that the court retain jurisdiction of the action for a period of time to assure enactment of modified State school aid provisions that do not violate either the State or Federal Constitutions.
The ultimate relief sought by the defendants is the dismissal of the complaints of both groups of plaintiffs.
[Material omitted for purposes of publication.]
STRUCTURE OF DECISION AND FINDINGS OF FACT
The procedural course chosen by the parties, involving presentation of proposed findings of fact before final submis *482 sion of the case, has required that the court render its decision and simultaneously prepare findings of fact. The fact that they are being made at the same time requires that there exist a correlation between them. Consequently, it is appropriate to point out certain features of the organization and structure of both the findings of fact and the decision.
With clarity and ease of review in mind, the court chose not to construct de novo findings of fact. Instead, after analyzing the proposed findings of fact submitted by the two groups of plaintiffs and reviewing the evidence relevant and material to them, the court has adapted the documents containing such findings in a manner that reflects the disposition made of the numerous requests to find. This has been accomplished, it is believed, by a process of retention, deletion and modification. Proposed findings that were adequately supported by the evidence have been made the court’s findings by leaving them intact. Other proposed findings that in the court’s view were not so supported or that have been deemed otherwise unacceptable or inappropriate have been physically deleted by a method which nevertheless has preserved their original legibility. As to those proposed findings which were deemed acceptable with modification or correction, appropriate modifications or corrections have been made by striking objectionable language or inserting modifying language or both.
In the course of revising the proposed findings, the court has retained to the extent practicable the references to evidentiary sources that provide support for particular findings. This has necessitated an independent item by item examination of the cited material and a determination concerning matters of accuracy, relevance and probative effect. It was of course, inevitable that in documents of such length, complexity and detail some unintended errors would occur. Where the court discovered through its own independent check of cited matter that it was incorrect, inapposite or deficient in the probative force claimed for it, a revision was made by insertion of necessary corrections or by deletions done in such a way that on review the original version as proposed can still be read.
The organization of the decision generaly parallels the findings of fact and is intended to complement and in some instances to supplement them. Preceding segments of the decision have described various aspects of this litigation having to do with the origin of the lawsuit, identity of parties, nature of the claims being litigated, the period devoted to the *483 trial and the results of the work done during the posttrial period. There follows next a discussion of certain matters that have a common bearing upon the claims of both sets of plaintiffs. The nature of such matters is such as to permit a unified rather than a separate treatment particularly in view of the fact that the material is amply supported by the evidence and stands substantially uncontroverted by the defendants. Those matters relate to the historical development of State aid for education in New York and the manner in which State aid legislation operated at the times relevant to this litigation. The decision then addresses itself to the original plaintiffs’ case and the facts found to have been estalished therein. Following the order of the trial, the decision next considers the case of the plaintiffs-intervenors and the facts found to have been supported by the evidence. There are treated in the concluding portions of the decision the respective legal conclusions which flow from the facts found in respect of the claims of each group of plaintiffs.
[Material omitted for purposes of publication.]
THE 1974 STATE AID LEGISLATION
The principal features of the 1974 legislation which were pertinent and applicable at the time of trial (L 1974, chs 241, 718) were described by several witnesses and in certain of the trial exhibits. In broad outline, these features formed a pattern now described.
The plan called for State assistance to enable each district to raise $1,200 per pupil by levying a 15 mill tax on its own tax base. If the 15 mill tax levy resulted in a figure less than $1,200 per pupil, the State supplied the amount necessary to reach that level. The statute provided a special method for counting pupils as part of the process of determining how the State aid was to be distributed. This involved refinements beyond the mere calculation of the average number of pupils present on each regular school day in a given period. In order to give recognition to differences in the cost of educating children at different school levels as well as cost differences in educating children whose physical, mental, emotional or socioeconomic background called for educational techniques adapted to their particular needs, various weightings were provided to produce a pupil count reflective of such specialized factors.
Under a strict application of the aid formula just described, *484 a school district with full property value of more than $80,000 would automatically be rendered ineligible for State aid (15 mills x 80,000 = 1,200). There was included in the 1974 State aid statute a so-called "flat grant” provision, however, which assured that every school district, regardless of its property wealth, would receive a minimum sum from the State. By the use of a formula applicable to districts with full valuation ranging from $52,800 to $101,000 there results a decrease of aid per aidable pupil unit from $408 at a valuation of $52,800 to $360 at a valuation of $101,000. A district with a full valuation above $101,000 is guaranteed a minimum of $360 in State aid per aidable pupil unit.
The other features included in the 1974 aid statute operate to cause all but a few school districts to receive State aid on a basis altogether different from the workings of the aid formula with its various weightings. These features are the so-called "save-harmless” provisions of the statute. There are two types of save-harmless provisions. The purpose of each is to guarantee that a district will receive at least as much State aid this year as it received last year. Under what is called "per pupil save-harmless” a school district is guaranteed that it will receive at least as much aid per aidable pupil unit in the current year as it did in the preceding one. That type of save-harmless aid is important to growing districts. With property valuations rising, districts growing moderately in pupil population but rapidly in property value become wealthier causing a reduction in the amount of State aid per pupil. The "per pupil save-harmless” provisions of the statute negate the operation of that part of the State aid formula that would otherwise control under those conditions.
The other type of save-harmless provision is called "total save-harmless.” It provides that a school district will not receive less total State operating expense aid in the current year than it received in the preceding one. This type of save-harmless provision is particularly helpful to school districts that are losing pupil population since they continue to receive the same amount of State aid even though they have fewer pupils and this, in turn, means that they actually receive more money per pupil. The inclusion of save-harmless provisions in statutes governing State aid did not start with the 1974 legislation. At the time of the enactment of the 1974 changes in the State aid formula there were over 300 school *485 districts receiving State aid on the basis of save-harmless provisions under the so-called Diefendorf Law.
Evidence at the trial showed that because of declining school populations and increasing property values, almost all school districts found it to their financial benefit to calculate State aid entitlements on the basis of one or the other of the save-harmless provisions. At the time of trial the evidence was that 699 of the State’s 708 major school districts were operating under save-harmless provisions of the 1974 State aid law. It was also shown that 18 districts were receiving aid based on their 1965 entitlement as the result of the use of save-harmless calculations. The almost total use of save-harmless provisions operates to vitiate the equalizing purposes of the State aid formula and perpetuates inequities that were supposed to have been corrected or at least ameliorated.
Finally, the 1974 legislation provided additional types of State aid for such things as buildings, transportation, Boards of Co-operative Education Services (BOCES) as well as for various types of categorical programs.
Having described the development of State aid to education in New York and its basic design as embodied in the 1974 legislation, attention is now directed to the facts developed at the trial in support of the claims of the original plaintiffs.
THE ORIGINAL PLAINTIFFS’ CASE
NEW YORK’S SCHOOL FINANCE SYSTEM IN OPERATION
The funds to support the public schools in New York come primarily from two sources. The first of these consist of revenues generated by taxes imposed, except in the case of cities, by independent school districts on real property situated with school district boundaries. In the case of cities (whose school districts are often referred to as "dependent”) revenues generated by tax levies on real property together with revenues from other sources provide funds to defray the costs of municipal services of which education is but one.
The second source of funds for public education in the independent as well as dependent school districts is State aid money appropriated and distributed under the various provisions of the State aid statute. A third source of funds is Federal aid. As a component of all the revenues available for school finance in New York, the evidence demonstrated that Federal funds provide a relatively small proportion of the total, usually running below 5%. At the time of trial, State *486 aid of all kinds provided about 40% of the funds required to defray total expenditures of all the school districts in the State. Thus, the major portion of school financing comes from revenues raised by local taxation.
It is evident from the basic pattern of the 1974 State aid legislation earlier described that a particular school district’s capacity to provide local financing of the cost of operating its public schools is directly tied in with its taxable real property wealth.
The several hundred school districts of the State display a wide range in real property wealth available for use as the tax base to provide local revenue for support of public schools. This has been demonstrated by a special study prepared by Dr. Joel Berke, a witness for the original plaintiffs, from official data supplied by the State Education Department. It is similarly documented in studies prepared by witnesses called by the defendants.
Dr. Berke’s analysis revealed that in the 1974-1975 school year, the range in real property wealth among school districts extended from $8,884 in the poorest district to $412,370 behind each pupil in the wealthiest district, a ratio of 46 to 1. Excluding all districts falling in the category of the wealthiest 10% and those found in the poorest 10%, the same study found that the disparity in taxable real property wealth was still present. Specifically, the school district at the 90th percentile had over $86,000 in full value while the school district at the 10th percentile had only $20,840, a ratio of more than 4 to 1. Whereas the average district wealth was $49,000, Dr. Berke’s study showed substantial numbers of school districts having property wealth greatly different from the average. Property wealth of less than $20,000 of full value per pupil was found in 58 districts and another 149 districts had less than $28,000 of full value per pupil. The study also revealed that there were 162 districts with more than $60,000 of full value per pupil.
The disparities in real property wealth are wide even within individual counties of the State. The same study showed that in Nassau County there were three large districts (Manhasset, North Shore and Great Neck) with more than $124,000 of full value per pupil and three other large districts (Levittown, Roosevelt and North Merrick) with approximately $30,000 full value per pupil. In neighboring Suffolk County there were three districts with over $370,000 in full value per pupil and *487 three others that had less than $27,000 of full value per pupil. In Westchester County the range extended from one district with over $330,000 of full value to others with less than $37,000, a ratio of nearly 9 to 1.
Large numbers of school children are affected by these disparities in real property wealth. Only 18% of New York’s pupils live in school districts that have real property wealth that is within 10% of the average wealth per pupil of $49,000. Over half of the State’s pupils (54.7% of the 2.3 million pupils outside New York City) live in school districts whose property wealth is more than 25% above or 25% below such State-wide average real property wealth. In sum, more than half the school children of New York live in school districts having a full value per pupil of more than $61,870 or less than $37,122.
The disparities in real property wealth among New York’s school districts and the consequent disparities in the fiscal capacities of those districts have been noted in a succession of studies made under State auspices, some of which were prepared by or under the direction of witnesses called by the defendants.
The 1972 Report of the New York State Commission on Quality, Cost and Financing of Elementary and Secondary Education (Fleischmann Commission) stated: "The evidence appears conclusive that the present system of finance discriminates against low-wealth districts and large districts while favoring the small and rich. These discriminations are contrary to long-established aims of the State to promote equity and, incidentally, to establish efficient organization of school districts, aims which run back a half century in time.”
An August, 1973 study prepared for the Working Task Force on State Aid for Elementary and Secondary Schools under the direction of Miss Lois Wilson, a witness called by the defendants, showed a similar pattern of unequal access to fiscal resources among school districts and contained the following comment: "The resources behind pupils in New York State’s 719 major operating districts (i.e, districts with eight or more teachers) currently vary by a ratio of about 41:1 according to the State Education Department’s 1971-72 basic fiscal data computer run”.
In the fourth report of the 1973-1974 Task Force on State Aid for Elementary and Secondary Schools entitled "Historical Perspective on Chapters 241 and 718 of the Laws of 1974” issued in December, 1974 during the administration of Cover- *488 nor Malcolm Wilson, there appears the following: "Widening disparities in per pupil wealth among the districts have resulted from the uneven incidence of increased property values and declining numbers of school children, making achievement of equalization of educational opportunity increasingly difficult”.
In another study dated April, 1975 prepared under the direction of Miss Wilson and entitled "Overview of School Finance Inequities in New York State” the pattern of unequal access to fiscal resources was again noted in the following statement: "New York State has more than 700 major districts with 8 or more teachers. The wealth of these school districts now varies by more than 52 to 1”.
The Governor’s Task Force on Aid to Education in volume 1 of its report to Govenor Hugh L. Carey dealing with school finance dated April, 1975 said: "The results of this inequitable structure of school finance in New York are similar to the problem in many other states. Local school districts with high property valuations per pupil have been able to spend large sums on public education with lower than average tax efforts. On the other hand, local school districts with low property valuations have had to exert above average tax efforts only to realize below average expenditures. The outcome has been high taxes and underfinanced schools for pooor people and lower taxes and well financed schools for the more fortunate”.
The draft analysis prepared under the direction of Miss Wilson in January, 1976 for the Governor’s Advisory Panel of Consultants entitled "Inequities in New York State’s System of School Finance” made use of data that was somewhat later than that used by Dr. Joel Berke in his analysis. Nevertheless, the later study found that the property wealth of the more than 700 major school districts in the State for the 1976-1977 school year varied by more than 46 to 1. It also found, as did Dr. Berke, that the same pattern of gross wealth differences existed within single counties.
A subsequent study prepared in October, 1976 for the same advisory panel under the direction of Miss Wilson again found that school districts in New York exhibited a wide disparity in property wealth.
Just as there is a wide disparity in property wealth among school districts there is also a wide variation in operating expenditures per pupil in New York’s school districts. It is *489 that variation in operating expenditues which is next considered.
Dr. Berke’s study found that the range in district spending per pupil ran from a low of $936 to a high of $4,215, a ratio of 4.5 to 1. When all districts in the top and bottom 10% of the range were eliminated, a pattern of disparate expenditure levels still remained. The school district at the 90th percentile spent $2,051 per pupil while the district at the 10th percentile spent $1,089 or a little more than half of the higher amount. This disparity in expenditures affects not only large numbers of school districts but substantial numbers of school children as well. On the order of 1,750,000 pupils attend schools in the 443 districts that Dr. Berke found spent 25% more or 25% less than the mean operational expenditure of $1,458. If New York City data were to be included, Dr. Berke’s study found that an additional 1,000,000 pupils would be added to those outside the middle 50%.
The finding that operating expenditures vary widely among school districts was supported by studies prepared by or under the direction of witnesses produced by the defendants. The two studies prepared for the Governor’s Panel of Consultants in 1976, which have previously been mentioned, document this conclusion as is more pointedly described in the findings of fact.
The claim of the original plaintiffs that there is an unmistakable relationship that exists between the patterns of property wealth and the level of educational expenditures in New York’s school districts is supported by the evidence. That support is found not only in the study prepared by Dr. Berke for the original plaintiffs but also in the October, 1976 study done for the Governor’s Advisory Panel of Consultants and even in the study produced by Mr. Charles Cook for use in the presentation of the defendant’s case in this action. Dr. Berke concluded that there was "a direct, positive, and significant correlation between property value and expenditures. That is, the wealthier a district in property value, the more it spends per pupil; the poorer the district, the less it spends.” The October, 1976 study for the Governor’s Advisory Panel of Consultants noted that for the 1975-1976 school year "there was a marked difference within various per pupil wealth intervals — from an average of $1,789 for the 44 districts with less than $15,000 full value per pupil to $3,744 for the 21 wealthiest districts which have from $120,001 to $330,000 full *490 valuation per pupil”. Mr. Cook’s study found that differences in local property wealth are the principal factors in determining expenditure differences, explaining more than 80% of the spending variations.
The method of providing State aid enacted by the Legislature makes it more likely that districts with high property wealth will spend more per pupil than districts with low property wealth. There is an explicit linkage of property wealth to schools spending in the statutory plan because it assumes a spending level of $1,200 per pupil and makes provision for State aid to districts to reach that level of spending provided they impose the same 15 mill tax. Widely different levels of property wealth mean that the imposition of the same tax rate will raise widely differing amounts of revenue. Thus the statutory plan makes it easy for wealthier districts to achieve high levels of spending while making it difficult, if not impossible, for poorer districts to do so. Graphic evidence of the extent to which the imposition of the same tax rate will produce extremely different revenue raising consequences is found in the study prepared by Dr. Berke and is set forth in part in the findings of fact accompanying this decision.
SIGNIFICANT CONSEQUENCES OF DISPARITIES IN EXPENDITURES
The inability of school districts having comparatively low property wealth to attain the expenditure levels of school districts possessing higher property wealth in the same county or region produces significant consequences. The nature of such consequences as revealed by the evidence is delineated in some detail in the findings of fact accompanying this decision. It is deemed sufficient here to mention them in summary fashion.
It is important to keep in mind that the real property within a school district’s boundaries is not only the tax base for local school tax revenues but the base for separate and distinct tax levies to support the services supplied by other governmental entities such as counties, towns, villages and certain types of special districts.
An especially burdensome consequence for districts with relatively low property wealth is that such districts are placed in the position of having to tax property at much higher rates to reach the same or lower levels of expenditure than is the *491 case in districts with higher property wealth. The imposition of high rates of taxation produces serious effects on the residents of and the educational services supplied by districts with low property wealth. In the Roosevelt School District in Nassau County, the evidence showed that the real property tax burden has contributed to substantial numbers of foreclosure actions affecting residential properties and furnished an incentive for persons to move out of the district. The tax burden upon the residents of the Levittown School District in Nassau County has made it increasingly difficult to obtain voter approval of school budgets causing operation of the school system on the basis of a contingency budget, more commonly referred to as an "austerity budget.”
Another consequence of disparities in expenditures is the difference in professional staff ratios found in districts having greater property wealth when compared with those with lower levels of property wealth. The study prepared by Dr. Berke found that "with hardly an exception, the higher the expenditure category, the better the ratio between the pupils and professional personnel”.
The disparity in expenditure levels has an effect upon class size. There is admittedly no universal agreement among educators as to whether the use of smaller classes has an effect on academic achievement that is measurable by means of standardized tests. This lack of agreement, however, does not alter the fact that school districts possessing the capacity to maintain higher levels of expenditure do, indeed, utilize that capacity to maintain a lower level of over-all class size. In contrast, districts with lower property wealth find themselves lacking the flexibility to do so. Class size is essentially a function of the number of teaching personnel available per pupil. That is to say, the higher the number of teachers in a district, the greater the probability that such district will have sufficient classroom teachers to operate small classes. Inasmuch as teacher compensation is an expensive element in the totality of school expenditures, low property wealth districts find it extremely expensive to reduce class size.
The capacity of a school district to provide a curriculum of variety and breadth is affected by the disparities in expenditures levels. Particular areas affected include such things as educational opportunities for gifted pupils that are provided by advanced placement programs and other advanced courses. Because such offerings entail more teachers and, in some *492 cases, smaller classes, districts with lower property wealth find it difficult, if not impossible, to provide such programs. Similarly, districts with lower property wealth find themselves unable to provide the continuity of an extended number of years of foreign language study or the variety of foreign language offered as is the case in districts possessing greater property wealth.
Other consequences of the disparities in expenditure levels are reflected in the inability of low property wealth districts to offer adequate programs or courses in the arts and to supplement the instructional program with enriching experiences such as field trips which are available in districts having the capacity to maintain higher levels of expenditures.
School districts with higher levels of expenditures employ teachers with significantly higher median number of years of experience and more masters degrees than is the case with school districts having a lower level of expenditures. The experience and training of teachers is reflected in the salaries they are paid. f Observable differences between what high and low spending districts are able to pay for teachers with more advanced levels of experience are found at various steps in teacher salary scales. Because teachers with greater experience and training can command higher salaries, the districts with lower expenditure levels are placed at a disadvantage in recruiting their teachers. The study done by Dr. Berke indicates that lower spending districts are further disadvantaged in comparison to higher spending districts in that they have a much higher percentage of teachers with temporary certification.
As more particularly set forth in the accompanying findings of fact, evidence adduced at the trial points to the conclusion that teacher experience and advanced degrees, whether in their own right or as proxies for other teacher characteristics, affect student achievement in some respects. It must be recognized that controversy exists in educational circles as to whether academic achievement is measurably affected by such considerations as class size or by employment of teachers with greater experience and advanced degrees. But the existence of such divergence of views does not necessarily lead to the conclusion that a school finance system operates equitably which enables districts with higher property wealth to have smaller classes and to hire teachers with more experience and greater training but which, as a practical matter, either *493 precludes or makes extremely difficult like choices by districts of lower property wealth and the consequent denial of expanded educational opportunities for their pupils.
Under the umbrella title of "Pupil Personnel Services” are found services that are supplied to pupils by members of a school’s professional staff other than classroom teachers. The category includes guidance counsellors and school psychologists. Dr. Berke’s study showed that districts with the capability of higher levels of expenditures employ more professionals to supply such services than do the districts with lower property wealth. That study found that school districts spending at the lowest levels had only 2.51 pupil personnel staff per 1,000 weighted average daily attendance. Districts spending at the highest levels had 5.94 per 1,000 weighted average daily attendance. The pattern of disparity in the ratios of pupil personnel staff per 1,000 weighted average daily attendance was found both in respect of guidance counselors and school psychologists.
Children with severe speech or hearing impairment require special attention. Such impairments can have impact on a child’s learning in the early years in differing ways. If inadequately dealt with in those years, the impairment may continue to impede the child’s learning capacity throughout the educational process. Regulations of the Commissioner of Education prescribe the frequency of service for children with such impairments in school districts providing therapy. Other regulations limit the case loads of teachers who service not only children with severe speech impairment but others with speech impairments who do not qualify as being severely speech impaired. Evidence at the trial showed examples of the inability of certain school districts with lower property wealth to provide the level of service mandated for pupils with speech and hearing impairments as well as the measures required to be taken in attempting to do what could be done within their fiscal constraints. In contrast, evidence was presented as being illustrative of the levels of speech and hearing therapy provided by school districts with greater property wealth for children with the same kind of impediments.
Another consequence of the disparities in expenditures between school districts of high property wealth and those with low property wealth is the existence of chronic shortages of supplies and equipment in the low spending districts needed to support an educational program. The findings of fact accom *494 panying this opinion set forth the details of this problem and how it has affected particular school districts having low property wealth and low expenditures.
Attention now shifts to a consideration of the case of the plaintiffs-intervenors’ proceeding from an initial synopsis of the theories advanced by them to a discussion of the facts elicited at the trial to support the claims made.
plaintiffs-intervenors’ case
INTRODUCTION
At the outset it is in order to indicate as concisely as practicable the several underlying theories on which this group of plaintiffs (sometimes for brevity’s sake called "intervenors”) attack the New York State aid system. The intervenors recognize that a major purpose of State aid for public education has long been that of equalizing the ability of school districts to finance education. Also recognized is the fact that the State aid formula challenged in this litigation has the same purported objective. The intervenors claim, however, that the State aid formula is flawed because in actual operation the formula fails to adequately measure the true capacity of large urban school districts to finance public education.
Under the theory of "municipal overburden” the intervenors point to the fact that the State aid formula’s basic measure of a school district’s ability to finance its schools is the amount of real property value behind each resident student in average daily attendance. In the case of the large urban school districts real estate valuations per pupil are relatively high because of the presence of various types of real property with high value. When applied to the urban school districts, this "property per child” yardstick of fiscal capacity, according to intervenors, produces a distorted and unrealistic picture of true capacity. The difficulty arises from the fact that urban school districts do not themselves levy the taxes which provide revenue to finance public education. The urban school district is dependent upon the city in which it is located to provide it with the funds needed to run the schools. The city levies taxes on the real property within its borders to raise funds to help pay the costs of a variety of municipal services of which education is but one. It is the contention of the intervenors that the inexorable costs of providing a large number of noneducational services reduced the amount of *495 revenue derived from real property taxation and available to finance education. It is this need to provide those noneducational municipal services which is called "municipal overburden” and which the "property per child” State aid standard does not adequately take into account. Because of this the intervenors claim their school districts are made to appear to have a greater fiscal capacity when in actuality their ability to finance public education is impaired by the need of the cities in which they are located to provide and pay for those other services.
Another theory advanced by the intervenors which encompasses several elements is that of "educational overburden.” Under this theory the intervenors claim that costs are higher in metropolitan areas with the result that money available for education costs buys less in such areas. Education costs are increased in the large urban districts because the State aid formula uses average daily attendance instead of school enrollment as a measure to determine State aid thereby overstating the cities’ fiscal capacity and penalizing them for their heavy burdens of absenteeism. The intervenors further contend that although they have the greatest concentrations of children with conditions that impede their educational progress, the State aid statute fails to give adequate recognition to the higher costs involved in providing services to such children in need of special types of education.
Finally, the intervenors challenge the state aid scheme for its alleged failure to give adequate recognition to the impact of educational overburdens in the cities. It is contended that the failure to provide State aid with proper allowance for the factors of educational overburden denies educational opportunities to children whose ability to get an education is impeded by a variety of educationally handicapping circumstances or conditions.
Each of the foregoing theories is considered in sequence. The proposed findings of fact submitted by the plaintiifs-intervenors have been reviewed to ascertain whether they are supported by evidentiary material presented at the trial and whether they represent appropriate findings necessary to the court’s resolution of the issues presented for determination. By a process of elimination, retention and modification the court has arrived at a set of findings which are regarded as supported by the evidence. Those revised findings of fact, for the most part, contain specific references to the evidence upon *496 which they are based. The findings of fact as revised are set forth in a separate document clearly showing matter eliminated, retained or modified which is being filed simultaneously with this decision. Such findings are intended to complement and supplement the decision. As has been noted earlier, the filing of findings of fact permits this decision to treat the facts established by the evidence in relatively summary fashion placing emphasis on major points and leaving to the findings of fact a more detailed exposition of the relevant facts.
MUNICIPAL OVERBURDEN
At the trial the intervenors presented extensive evidence to establish the existence of the problem of municipal overburden affecting the large urban school districts and the failure of the State aid statute to reflect that factor in determining the amount of assistance provided. The basic data presented stands largely unchallenged. It demonstrates that the ability of the urban school districts to finance education within their borders is, indeed, seriously impaired by a cluster of demands on the urban tax dollar collectively known as a municipal overburden. In this portion of the opinion and the accompanying findings of fact the character and dimensions of the phenomenon are considered.
The intervenors do not find fault with the objective of the State aid statute here involved, i.e., to provide greater operating expense aid to the district that has a lesser fiscal capacity to finance its schools. But the intervenors point to the fact that the aid formula measures a district’s fiscal capacity by the amount of real property value behind each resident pupil in average daily attendance. In addition, the intervenors assert that the aid formula assumes that school districts are equally able to apply revenue from real property taxes levied on their real property tax bases for the support of their schools. This assumption, the intervenors claim, does not square with the facts and they have undertaken to prove that in some districts, such as the large urban district here, the cost of providing essential noneducational services caused a drain on local revenue thereby reducing the amount of money available for educational purposes. In short, it is this municipal overburden which impairs the fiscal capacity of the urban school districts to finance their education systems.
In the four cities involved in this litigation the evidence has shown that the complete tax burden (for nonschool and school *497 purposes) was substantially higher than was the case in the rest of the State. While jurisdictions outside of those cities were spending about 45% of their local taxes for schools, the cities were spending about 28%. If noneducational expenditures are measured in per capita terms, the four cities spent much more than surrounding counties and the rest of the State. In 1973 the per capita noneducational expenditures in the three up-State cities amounted to more than twice the per capita amount of similar expenditures in the remainder of the counties in which such cities are located. In New York City, using all revenue sources (local, State and Federal), expenditures, in 1974 for noneducational purposes amounted to $875.01 per capita which was more than twice the rate for the rest of the State and much more than was the case in the counties making up its suburbs. After adjusting New York City’s revenues so as to exclude Federal and State aid, the per capita expenditure for noneducational purposes in 1974 amounted to $401.06 whereas the figure for the rest of the State, exclusive of New York City, was $183.17. The higher level of noneducational expenditures in New York’s "Big Four” cities was not an aberration peculiar to those cities. The evidence showed that those higher expenditure demands for noneducational purposes fit the pattern found in central cities in all of the country’s 37 largest metropolitan statistical areas.
The intervenors presented convincing evidence in painstaking detail to establish that the higher noneducational expenditures in the cities are caused by the compelling, irresistible demands for municipal services that the urban environment and its characteristics create.
In New York City characteristics of its population, as well as physical characteristics of the city itself, generate the need for higher noneducational expenditures. The decade between 1960 and 1970 experienced a marked shift in the age distribution in New York City. An increase occurred in persons falling in the 15 to 24 bracket as well as the 65 and over bracket while the number of persons in the 25 to 64 age grouping decreased. The evidence showed a markedly higher proportion of New York City’s population to be below the poverty line than was the case in neighboring areas. This has meant increased numbers of persons who are recipients of public assistance. The level of educational attainment in New York City is decidedly lower than that found in the suburbs. The less educated portion of the population depends on manufac *498 turing enterprises for employment. Job opportunities have decreased as manufacturing concerns have moved away from New York City. Poverty and unemployment have created conditions which in turn generated demands requiring municipal expenditures.
The density of New York City’s population, the condition of its housing stock and the deterioration of municipal facilities because of deferred maintenance all contribute to bringing about high noneducational expenditures. As these demands siphon off the city’s revenues the percentage of revenue that can be allocated to education declines.
The conditions, characteristics and circumstances found in New York City were shown to be replicated in the three upstate cities. Concentrations of the poor and the elderly, large numbers of persons on public assistance rolls, high levels of unemployment and low education levels have all combined to increase municipal expenditures. To the foregoing must be added the cost-producing factors of old housing stock, deteriorating municipal facilities and a severe economic decline in recent years. As the findings of fact show in more detail, when individual categories of noneducational municipal services are examined, the cities necessarily spent more than other areas of the State.
Higher police expenditures in the cities were shown to be to a large extent the product of higher crime rates for both adults and juveniles. Contributing factors to higher crime rates have been population density, poverty and unemployment. The result has been that the four cities in this litigation had police expenditures that ran from two to six times greater than was the case in their suburban areas. Special conditions in New York City added to the problem of providing police protection. Those included, among others, a large body of daily commuters, great numbers of tourists, protection of foreign diplomats, drug-related crimes, policing of public events attracting crowds and the investigation of the activities of organized crime.
Fire protection was shown to be far more costly in the cities. The protection afforded by volunteer firemen in most communities has not been feasible for the cities. Density of population and building is a contributing factor to the greater fire protection expenditures in the cities. Constantly available fire-fighting professionals handling a variety of both ordinary and specialized equipment and capable of rapid response to *499 many differing types of fires have imposed far greater fire protection costs on the cities. These costs in recent years have been exacerbated by tremendous increases in the number of false alarms to which men and equipment have had to respond.
Public assistance for city residents has been shown to be a category of municipal expenditures over which the cities have relatively little control. In New York City public assistance has been a heavy drain on municipal revenues. The evidence showed that although only 43% of the State’s population resides in New York City, 70% of the State-wide recipients of public assistance were living in that city. Another dimension of the problem and its cost were revealed by the evidence that 12.5% of New York City’s population was on public assistance in contrast to 3.6% for the entire balance of the State. It is important to note that the number of persons eligible to receive public assistance and the type and level of benefits are governed by State and Federal regulations.
Health care expenditures in the cities were shown to be higher than elsewhere as a consequence of conditions prevailing in urban settings. The evidence showed that 67% of the State’s population eligible for Medicaid benefits were New York City residents. While the remainder of the State spent $15 per capita from local revenues on Medicaid, New York City spent $51 per capita from its local resources. As was shown to be the case with public assistance expenditures, New York City has had little control over Medicaid expenditures because eligibility for benefits and the kind and level of such benefits were determined by Federal and State authority. These higher health care expenditures in New York City were shown to be a reflection of more serious health problems among the city’s population.
Another drain on local revenues in New York City is the corrections system that by State law it is required to maintain. This system’s purpose is to hold persons awaiting court proceedings as well as those serving sentences. Factors adding to the city’s expense were shown to be the need to transport persons to and from courts, medical examinations and record-keeping. New York City’s cost per capita for its corrections system was shown to be approximately four times that borne by other localities in the State.
The court system which New York City must operate has been shown to require an expenditure of $14.72 per capita out *500 of local revenues at the same time that the rest of the State was paying only $8.07 per capita. The greater expenditure was caused by the greater work load in the city’s courts. In the criminal justice field, the evidence established that in 1973-1974 of all the Grand Jury indictments and Grand Jury dispositions in New York State, over 60% were in New York City. Nearly 70% of all the criminal cases disposed of in the entire State were disposed of in New York City.
Mass transit costs imposed a significant demand on local revenues in New York City. According to the evidence, transit operating expenses were $33.39 per capita in that city as compared to a level of only $6.64 in the rest of the State. Since public transportation carries more than half of the 3,000,000 persons, including nonresidents, entering the central business district each day, mass transit is essential for the city’s functioning.
Greater city expenditures for parks and recreational facilities were shown to be essential to meet the needs arising from urban density, poverty, old age as well as the needs of the city’s youth.
All of the cities in this litigation must subsidize public housing projects for low-income residents. Most suburban and rural jurisdictions do not have that demand on local resources. In addition to being required to pay operating deficits on State-sponsored housing projects, the cities must absorb other indirect costs for fire, police and sanitation services. At the same time tax revenues were reduced by reason of payments in lieu of taxes and tax preferences granted in connection with such projects.
The higher levels of spending for the erection of new schools in the cities were shown to be a reflection of the greater costs for land, labor and materials prevailing there. Because the State’s building aid formula failed to provide aid for costs above State-wide averages, the cost differentials affecting cities, to a large extent, have not been taken into account adequately. As a consequence, the cities have had to channel a greater share of local revenues into capital outlay and debt service.
In a number of areas, more particularly described in the accompanying findings of fact, the enactment of State laws has imposed higher levels of noneducational spending. Some of these have special application to New York City while others affect the up-State cities.
*501 The defendants did not present evidence contradicting the contention and proof of the intervenors that they had greater noneducational costs which diminished the extent of tax resources available to finance education. It was only the claim of the intervenors that such noneducational costs were inexorable that the defendants sought to disprove. The effort in that direction, however, was limited to evidence that audits by the office of the Comptroller of the State of New York had been critical of a portion of health and welfare expenditures in the City of New York. The defendants’ witness, Netzer, while expressing the opinion that many of the cities’ noneducational expenditures were not inexorable failed to undergird that opinion by showing how the cities could appreciably effect a reduction in those expenditures. Even that witness conceded that given a situation in which higher noneducational expenditures are unavoidable and the municipality’s tax rate cannot be increased, the State aid system should give recognition to those realities. The evidence demonstrated that the cities in this case are proper candidates for such recognition. They were shown to have the highest tax rates in the State and imposed real property taxes at about the constitutional limit.
The intervenors have satisfactorily established by the evidence presented their contention that in measuring local funding ability, the State aid formula overstates the cities’ capacity to finance their schools because it disregards the "municipal overburden” drain of noneducational services on the local tax dollar.
THE REDUCED PURCHASING POWER OF THE URBAN EDUCATION DOLLAR
It is the contention of the intervenors that the State aid formula is seriously defective because of its failure to take into account the extent to which educational costs vary among the State’s school districts. They assert that the aid formula, in effect, operates on the factually unsound assumption that the dollar has equal purchasing power for educational resources throughout the State. The intervenors presented evidence to demonstrate, contrary to the foregoing assumption, that educational costs were, in fact, generally higher in the down-State and metropolitan areas and also that certain other factors were the cause of higher educational costs in the State’s largest cities.
Data compiled in a study made under the auspices of the *502 Education Committee of the New York Senate showed that the average expenditure per pupil for the State-mandated minimum education program among typical down-State districts was 47% higher than the average expenditure in upState districts. The same study showed that the average expense among metropolitan area school districts was 29% higher than was the average expense level in rural districts. Those findings of higher costs in down-State and metropolitan areas were confirmed by cost-of-living data provided by the Bureau of Labor Statistics of the United States Department of Labor. Other evidence established that wages paid in private employment in New York City are higher than the wages paid elsewhere in the State.
Teacher salaries have constituted the largest component of school costs. In 1974-1975 the average classroom teacher’s salary in the New York City metropolitan area was $16,498 while the average salary in the up-State area was $12,737, a difference of 30%. When salaries of teachers were examined according to degrees held and years of experience, the median salaries for teachers in down-State districts showed that such districts had to pay more than up-State districts to avail themselves of teachers with comparable qualifications.
Other factors have made it necessary for city school districts to pay higher salaries than in suburban and rural districts. The large urban school districts have had to pay more to maintain the level of teacher quality in the face of hiring competition from other school districts. Contributing to this have been such considerations as the need to teach large classes having a high percentage of disadvantaged pupils; the need to perform teaching assignments with inadequate materials and supplies in deteriorating buildings; and the anxiety produced by the violence and vandalism in many city schools.
When the perception of city schools as unattractive places in which to teach is combined with other higher cost factors found in the cities, the result has been that the urban dollar purchases less in educational resources. By failing to take into account this reduced purchasing power of the urban education dollar, the State aid formula has exaggerated the actual capacity of'the cities to finance their schools from local revenues. No witness or exhibit was presented by the defendants to controvert the interveners’ claims of higher educational costs in the urban areas.
*503 THE USE OF PUPIL ATTENDANCE AS A MEASUREMENT FOR STATE AID
The intervenors challenge the fairness of the State aid formula because of its failure to recognize the financial impact of high pupil absenteeism in the large cities’ schools. The formula at two different points in the calculation of State aid uses a pupil count computed on the basis of average daily attendance rather than on the basis of enrollment. Average daily attendance is first used as part of a measuring device to determine a district’s ability to finance its schools. This is done by dividing the district’s total real property valuation by the number of resident pupils in average daily attendance. The resulting figure from that computation shows the amount of real property value behind each pupil. High absenteeism in the cities’ schools causes lower city school attendance rates. The lower attendance rates, in turn, inflate the assumed amount of real property wealth behind each pupil, thereby reducing the formula’s operating expense aid for each aidable pupil unit. At another point in the calculations, the aidable pupil figure is multiplied by the district’s weighted average daily attendance, rather than the district’s enrollment, to determine the aggregate aid for the district.
The intervenors assert that the use of average daily attendance instead of average daily enrollment produces a diminished pupil count in the cities’ schools which doubly reduces the amount of operating expense aid. They claim further that the resulting reduction in State aid is not only irrational but amounts to the imposition of a penalty on urban districts because of high rates of absenteeism which they cannot effectively control.
The evidence adduced by the intervenors showed high rates of student absenteeism to be a problem in large cities outside the State of New York. In New York State absenteeism was demonstrated to be substantially more of a problem in large city schools than elsewhere in the State. Average attendance rates in the five largest cities were approximately 84% in contrast to an average rate of 93.83% in the balance of the State. It was found to be particularly acute in the secondary schools.
At first glance it might be supposed that not having as many pupils actually present in school would mean a saving in money. The evidence, however, was that high rates of absenteeism not only do not result in any saving of money for *504 city districts, but actually increase their costs. The urban school districts must plan their operations and expenditures for the entire school population including those whose attendance becomes erratic or infrequent. In the cities of Buffalo, New York and Rochester, three to six times as much was spent in 1972-1973 for attendance services as was spent in other districts. In 1974-1975 Rochester had 13 times as many attendance officers per thousand pupils as did schools in the rest of Monroe County. Additional costs were generated by high absenteeism rates because of the need to provide programs for repetition and remediation to assist pupils whose learning progress was impaired by absence from classes.
As the findings of fact set forth in greater detail, the causes of high absenteeism in the large city school systems are traceable to poverty and its associated conditions. Some of the contributing conditions associated with poverty were shown to include higher incidence of illness among children from impoverished homes; lack of warm clothing in cold months; pupils kept at home to care for younger children in the family; lack of parental encouragement to attend school; impaired mental and emotional health; and lack of success in school.
The evidence presented by the intervenors showing that the high rates of absenteeism in city schools are causally linked to poverty and its associated problems affecting large numbers of pupils was not controverted. Some attempt was made to indicate that a more zealous enforcement of attendance would lessen the amount of absenteeism. But this was shown to be unrealistic in view of the limited resources the cities already had to devote to educational purposes. The dimension of the problem in New York City was graphically illustrated by evidence that in order for an attendance officer in the Borough of Manhattan to be the producing cause of additional State aid equal to his salary, he would have had to produce additional attendance of 58 pupils each day of the school year or 10,490 student days per year, an unattainable result in the light of poverty-related causes of absenteeism.
The use of average daily attendance as an appropriate measuring device was seen by two witnesses as providing a stimulus for high attendance rates. Beyond the expression of an opinion to that effect, neither witness supplied factual support for that view. The Regents of the University of the State of New York in November, 1976 recommended the use *505 of a pupil count based partly on average daily attendance and partly on enrollment ("Average Daily Membership”) as a means of providing a more equitable count of pupils. It is also appropriate to note that certain of the witnesses called by the defendants were in agreement that a pupil count based solely on average daily attendance was not justified and ought to be changed.
The evidence supports the intervenors’ claim that the State aid formula’s use of pupil attendance instead of pupil enrollment as a measure for State aid overstates the cities’ actual fiscal capacity and penalizes them for their high rates of absenteeism.
SMALLER STATE AID SUPPLEMENTS FOR SPECIAL NEED STUDENTS IN THE CITY SCHOOL DISTRICTS
The State aid formula recognizes that pupils who are disadvantaged, handicapped or have other special" needs require costly special services intended to cope with the difficulties such pupils encounter in acquiring their education. The formula implements that recognition by providing for extra weightings and special services and provisions applicable to those types of pupils. The intervenors contend, however, that such provisions actually discriminate against the large city districts in at least three respects with the result that the urban districts receive less extra aid than other districts for each special needs pupil despite the fact that the greatest concentration of special needs pupils is in the city districts.
The first respect in which the formula is claimed to discriminate against the city districts has to do with reduced extra aid for disadvantaged and nonseverely handicapped pupils in the city districts. Certain preliminary comments about "disadvantaged” pupils with special education needs are in order. The number of pupils with special educational needs (PSEN) is determined by annual Pupil Evaluation Program (PEP) tests given throughout the State in reading and mathematics to pupils in the third, sixth and ninth grades. These tests identify the proportion of pupils in each school district who score in the bottom three stanines or among the lowest 23% in the State. The evidence has shown that the four city districts who are among the plaintiffs-intervenors had 36% of the State’s pupils enrolled in their schools. In 1974-1975, however, those same city districts had 52% of all the pupils with special educational needs attending their schools. New *506 York City itself had 47% of the State’s pupils whose test scores placed them below minimum competence. In addition, the same four city school districts in 1974-1975 had 53% of the State’s pupils with nonseverely handicapping conditions.
In computing the amount of additional aid to be given for those disadvantaged and handicapped pupils under the formula at issue in this case, a PSEN pupil is given an extra weight of .25 and a pupil with a handicapping condition is given an extra weight of 1.0. These weightings, however, are applied to the reduced aid per pupil unit which itself was arrived at by using a measure which overstated the cities’ fiscal capacity to finance educational needs. That measure, as earlier discussed, by failing to give effect adequately to the factors of municipal overburden, reduced purchasing power of the urban education dollar and high absenteeism exaggerated the fiscal ability of the cities to finance their schools and thereby reduced basic operating aid per pupil. While the weightings furnished extra aid, the aid from such weightings has itself been reduced because the weightings have been integrated with a measure which has, at an earlier step of computation, treated the urban districts as less in need of aid than they actually were. The flawed result of a process intended to help meet the added costs of educating disadvantaged and nonseverely handicapped pupils has been, according to the evidence, to provide reduced and below-average assistance to the cities burdened with the greatest numbers and concentration of pupils in those categories.
CITY DISTRICTS AND THE AID FORMULA’S SECONDARY SCHOOLS WEIGHTING PROVISIONS
The State aid law challenged in this litigation took into account the increased costs of providing education at the secondary school level. A study was carried out in 1976 by the New York State Senate Committee on Education of a random sample of 41 city, suburban and rural schools. The large cities that are parties in this case were not included because of the differences in their methods of local financing. The study found that average secondary school costs per pupil exceeded average primary school costs per pupil by approximately 30%. While the State aid formula made provision for extra aid for secondary school pupils by means of a secondary weighting of .25, it failed to make that weighting applicable to those *507 disadvantaged and handicapped students attending secondary schools.
It is the contention of the intervenors that in actual operation the secondary weighting discriminates against the large urban districts and they presented uncontroverted evidence that supports such claim. That evidence showed that educating disadvantaged and handicapped pupils at the secondary level entails the same extra costs that are involved in educating so-called "normal” pupils. The special problems that beset the disadvantaged and handicapped children superimpose extra costs for the services designed to overcome or alleviate their problems. In short, the fact that those pupils have progressed to the secondary level of their education does not eliminate the need for expensive special types of services. The formula’s failure to allow the secondary weighting for disadvantaged and handicapped pupils had a markedly adverse effect on city school districts because they have been shown to have the highest concentration of such students at the secondary level. The result of excluding these categories of secondary school pupils from the secondary weighting provision of the formula was that only 46% of the five largest cities’ secondary school pupils were eligible for the .25 secondary weighting. In sharp contrast, the evidence establishes that 79% of the secondary school pupils in the rest of the State were eligible for such weighting.
The failure to have the formula give adequate recognition to the proportions of disadvantaged and handicapped children in urban secondary schools resulted in the five largest city districts receiving only 18% of the total amount apportioned through the secondary weighting aspect of the formula in comparison to 30% of the State’s total payable operating aid. Not only have the defendants not controverted the manner in which this aspect of the aid statute affects the urban districts, but one of their principal witnesses with concededly high knowledgeability in the field of school finance, concluded that the facts just summarized disclose that the secondary weighting provisions of the formula discriminate against the city districts.
REDUCTION IN AID FOR NONSEVERELY HANDICAPPED AND OCCUPATIONAL EDUCATION PUPILS CAUSED BY CITIES’ INELIGIBILITY TO USE BOCES AID FORMULA
New York has two separate aid systems for mildly *508 handicapped and occupational education pupils. All school districts outside the five largest cities are eligible to participate in BOCES (Board of Co-operative Educational Services). The five largest cities arrive at the amount of State aid for their mildly handicapped children by using a 2.0 weighting. That is, they receive twice as much aid for one of such pupils as for a normal pupil. The formula requires that a city first calculate its local share on the normal 15 mill basis (.015 X property tax base per RWADA). The figure resulting from that calculation is then subtracted from $1,200, thereby giving the amount of State aid for a "normal” pupil. That amount is then doubled to obtain the amount of State aid for each handicapped pupil. It must be noted that inherent in the foregoing computation is the element of determining aid by use of a mechanism which uses the amount of city property wealth behind each pupil. Just as such mechanism overstates the large cities’ wealth for aid purposes generally, as earlier discussed, so is that effect perpetuated in calculating aid for the cities’ handicapped pupils. It is thus seen that the large cities are aided in their expenses for these handicapped children only up to $2,400.
In contrast to that limit for the cities, school districts which participate in BOCES do not have a dollar ceiling on aidable expenditures. There are certain deductions that must be made to arrive at the district’s figure of "approved expenditures.” But except for those deductions, districts participating in BOCES receive State aid for allowable costs in any amount. Moreover,, such districts may compute their share and the State’s share of such allowable costs by the use of one of two options known as the "8 mill option” and the "aid ratio option.”
Under the 8 mill option a district making a high tax effort is rewarded. The local district’s share is calculated by use of the following formula:
.008 X total allowable expenditures district tax rate
When this formula is used and the local district’s share is determined the remainder of allowable costs is paid by the State. The higher the local tax rate, the smaller the fraction of expenditures to be borne by the district and the larger the State’s share.
*509 When the aid ratio option is used, the calculation of the State’s share of allowable expenditures is made by the following formula: aid ratio X total allowable expenditures. The aid ratio is a percentage that expresses the relationship between the tax base per pupil of the particular school district and the average tax base per pupil for the entire State.
The extent of the advantage of the BOCES formula available to nonurban districts is thus measured by two facts, allowable costs for services to the mildly handicapped and the local district’s tax rate. The more the allowable costs exceed $2,400 per pupil, the greater the advantage. The higher the tax rate the higher the aid per pupil because the BOCES formula rewards local school district tax efforts.
In addition, the noncity districts also have the option to use the extra weighting of 1.0 for their nonseverely handicapped pupils instead of the BOCES formula if that provides more aid.
The evidence demonstrated that if the intervenor districts were not excluded from aid under the BOCES formula they would have received substantially more State aid for their nonseverely handicapped pupils.
Noncity school districts participating in BOCES are entitled to use the same optional formulas in calculating State aid for their occupational education pupils as are used for the nonseverely handicapped. The large city school districts receive State aid for their occupational education students under what is known as "Special Services Aid.” That aid was calculated according to the 1974 version of the formula by subtracting from $1,200 a local share of 15 mills times full valuation per RWADA. Evidence presented by the interveners which compared what the cities received under the Special Services Aid Formula in 1974-1975 with what they would have received by use of the BOCES formula showed the cities received more than $15,000,000 less in aid under the Special Services Aid Formula.
In 1976 the Regents of the University of the State of New York in making their recommendations for legislation to the Governor and the Legislature reiterated their recognition of the inequity affecting the large cities by reason of their not having access to the more favorable BOCES formula.
As the findings of fact set forth, the intervenors have satisfactorily established by the evidence presented that the *510 intervening school districts have the highest concentration and numbers of pupils who are disadvantaged, handicapped or manifest special needs. Despite that fact, such districts have been shown to receive below average supplemental aid for those categories of pupils and that this is caused by the discriminatory features of the State aid formula discussed in the preceding segment of this decision.
Thus far, the discussion of plaintiffs-intervenors’ case has centered on their claim that the equalization purpose of the aid statute has fallen short of achievement because in actual operation the aid formula treats the large urban school districts as having greater fiscal capacity to meet the costs of public education than is the fact. In short, the discussion thus far has related to the intervenors’ claim and proof that the aid formula’s failure to take into account specific burdens of the large cities and their school districts has resulted in less State aid in contravention of the aid statute’s equalization purpose and constitutional requirement. Attention now shifts to another aspect of the intervenors’ case which was identified during the trial as being the area of the "education overburdens” that affect the large urban school districts.
THE STATE AID FORMULA’S DISREGARD OF THE EDUCATION OVERBURDEN OF THE LARGE URBAN SCHOOL DISTRICTS AND THE EFFECT ON EDUCATIONAL ACHIEVEMENT
At the core of this aspect of the intervenors’ case is the contention succinctly stated during final argument, that the large cities of the State "have the most difficult and the most expensive school populations in the State to educate”.
The asserted basis for that contention is that the extraordinary problems stemming from urban poverty and its associated ills in turn created an array of educational overburdens that the large cities have been unable to cope with by resort to their own fiscal resources and which are essentially disregarded by the State aid formula. Because of this the urban districts further contend that although they have the largest concentrations of disadvantaged children requiring compensatory education, they are unable to supply that help, thus resulting in a denial to those children of an equal educational opportunity.
In support of those contentions the intervenors undertook first to delineate the effect of poverty in the larger cities on public education. As shown in more detail in the findings of *511 fact, the cities have more poverty and more economically disadvantaged pupils than other areas of the State. Dependency on welfare in its various forms was shown to be a valid indicator not only of poverty itself but of the educational problems that are poverty-related. The evidence established that New York City, with 43% of the State’s population, nevertheless had approximately three fifths of all the families in the State with a mother in the role of head-of-the-family and approximately two thirds of all the persons in the State receiving assistance from the program known as Aid to Families with Dependent Children (AFDC). The evidence also demonstrated that between 1960 and 1970 the number of families in New York City headed by a mother alone increased by approximately 81%. Between December, 1965 and June, 1975, the number of New York City children receiving aid for dependent children doubled, rising from 315,306 to 649,347. In up-State Rochester 42.5% of that city’s elementary school pupils were found economically disadvantaged. The standard for eligibility under title 1 of the Federal Elementary and Secondary Education Act indicated another measure of poverty affecting New York City’s school children. That standard employs welfare status and family income. With 31% of the public school enrollment in the entire State, New York City had at least 65% and, according to one of the defendants’ witnesses, perhaps as much as 80% of all the pupils in the State eligible for title 1 assistance.
Buffalo, Rochester and Syracuse had among the highest proportion of children from low-income families and homes receiving Aid to Families with Dependent Children. Limited family income made about half of the school children of New York City and Syracuse and more than two thirds of the children in Buffalo eligible for free school lunches.
The effects of poverty and the conditions associated with it on school children in the large city districts were charted with evidence both extensive and intensive in its scope. The enormous amount of evidence bearing upon the education overburden of the large cities was organized into eight separate categories. The findings of fact treat each such category and the elements within it. Here, it is deemed sufficient to address them in more summary fashion.
IMPAIRED LEARNING READINESS
Urban poverty generates a variety of living conditions *512 which prevent many children in large cities from being ready for school when they enter. As compared to children of the same age from middle-class families, many of the urban children have not been exposed to the benefits that flow from such things as adequate housing, proper food, adequate parental supervision and preschool experiences leading to learning readiness. Lack of learning readiness requires special assistance if a child is to acquire an adequate education. Compensatory education programs designed to overcome lack of learning readiness are expensive and the larger city school districts were shown to lack the local resources to supply the assistance for the extremely large numbers of children who needed early help. Failure to furnish such help at the early stage of the child’s educational career creates the likelihood that such child will fail to attain adequate levels of achievement and that learning problems will become worse as the child moves ahead to higher grades in the city schools.
IMPAIRED LEARNING PROGRESS
The same conditions associated with poverty that caused many city children to begin school with a deficit in learning readiness continue to exist for such children as they move along in the school system. The evidence has established that needed compensatory education was unavailable to many children. But it has also shown that even when it has been possible to provide compensatory education to certain of the city pupils, the poverty-related conditions of life that were responsible for the learning readiness deficiency still remain and represent impediments to academic progress and achievement. The findings of fact contain a listing of poverty-related conditions that impede the progress of pupils in large city schools. Only a few need be mentioned here. Lack of proper food, clothing, medical care, as well as proper recreation interfere with educational progress. Overcrowded and noisy living quarters interfere with a child’s study. Frequent moving of the family from one place to another causes interruptions in the progress of school work and has an adverse effect on achievement. Not infrequently urban children have been shown to engage in part-time work which not only leaves less time for school work, but drains their energy leaving them tired and lacking in energy when attending school. These conditions, in combination with others detailed in the findings of fact, produce a cluster of adverse effects upon children’s *513 work in school, that include distraction from school work, undone homework, disruption of the progress of learning in a sequential manner and lack of motivation to attend school and to achieve.
Measures to counteract and overcome the adverse effects of poverty-related conditions on great numbers of city school children require funds beyond those allocated for regular educational programs. The cities, with their reduced State aid, have been unable to finance the compensatory education programs to offset the burdens brought to school by children living in poverty conditions.
IMPAIRED MENTAL AND EMOTIONAL HEALTH
The large cities are burdened with disproportionate numbers of pupils with mental and emotional problems. Here again, conditions of life in urban poverty were shown to be principal contributing factors. The findings of fact list specific causes and factors as well as the effects they have on mental and emotional health of city school children.
The educational problems that flow from impaired mental and emotional health were shown to be susceptible to remediation. Successful programs for that purpose require extra funds and personnel. The cities, with their reduced aid and fiscal constraints, have been forced to cut back or eliminate the programs and personnel that are needed to cope with such problems. Reductions in staff have caused unmanageable case loads for the staff members remaining. As a result the school problems associated with impaired mental and emotional health have continued.
IMPAIRED PHYSICAL HEALTH
The large cities were shown to have a substantial overburden of pupils with impaired physical health. This overburden, like those already discussed, has been shown to be rooted in the poverty conditions in which such a high percentage of the children live. The findings of fact recite not only the greater incidence of health problems among poor children, but also the disproportionate prevalence of specific types of health problems among them. The evidence has shown that children living in urban poverty generally receive inferior medical care and the findings of fact set forth reasons why that has been found to be the case.
*514 The evidence has confirmed what common sense would predict, namely, that the combination of greater prevalence of health problems and lack of good medical care would result in absences from school and impairment of performance in the classroom.
Measures aimed at preventing or remedying health problems in many cases call for trained health personnel in adequate numbers to provide health education, identification of health problems, notification of parents and arranging for appropriate remedial treatment. Providing such services was shown to be more costly in the large cities. With their reduced school aid and local fiscal constraints, the cities have not been able to provide the level of health services needed by their pupils.
HANDICAPPED CHILDREN
The greater number of handicapped pupils found in the large cities is another severe overburden for their educational system. The large cities in 1974-1975 had more than their share of handicapped pupils, as was shown by a comparison with their suburban areas. In recent years there have been marked increases in children with handicapping conditions in those cities. The increase in the numbers of handicapped pupils paralleled the increase in the number of pupils from poverty homes. Combinations of handicaps (such as deafness and severe emotional disturbance accompanied by speech and language handicaps) frequently exacerbate the problem of educating children. In addition to the categories of handicapping conditions recognized by State law, there were shown to exist substantial numbers of pupils whose learning progress was impeded by "learning disabilities.” These are inabilities caused by minimal brain dysfunctions and manifested in an inability to receive, organize or express information normally. It was estimated that 10% to 30% of New York City’s school children are afflicted with learning disabilities.
The evidence proved that it is expensive to provide the testing and evaluation of handicapped children and to furnish the type of instruction and therapy their conditions require. The large cities, because of their reduced fiscal capacity and reduced State aid, are unable to provide the services needed to test, evaluate, treat and instruct all of their handicapped children. Fiscal constraints have compelled the large cities to cut back substantially on their mental health and special *515 education staffs. As a consequence, pupils in need of special help failed to receive appropriate instruction and treatment.
FOREIGN LANGUAGE CHILDREN
The report of the Fleischmann Commission estimated that in 1970 there were 100,000 pupils in New York State’s public schools with significant handicaps with the English language and that 85% of those pupils were in New York City. Tests given in 1975 and 1976 to foreign language-speaking pupils in New York City showed that from 100,000 to 110,000 were unable to participate effectively in English. While this is predominantly a problem affecting New York City because of its status as a major port of entry, the evidence showed that the up-State cities are faced with the problem to a disproportionate extent. The three up-State cities, together with the city of Yonkers had 7% of the State’s total enrollment outside New York City in 1974-1975, but they had 13% of the American Indian and Asian pupils and 21% of the Spanish surnamed pupils.
In New York City the pupils lacking facility in English are not only numerous but they reflect diversity of national origin and language. Between 30 and 40 different foreign languages were shown to be represented. The problem of non-English-speaking pupils is made more difficult by the shifting composition of the foreign language population as new groups arrive from different foreign areas.
The evidence showed that among the body of immigrant children, there were substantial numbers who not only were nonspeakers of English, but who were also illiterate in their native language.
The presence of such substantial numbers of non-English-speaking pupils has been shown to constitute another educational overburden for the large cities. Under both Federal regulations and court decisions school authorities have been required to make their instructional programs meaningfully available to such pupils. The implementation of those mandates requires special expenditures beyond those required for the ordinary English program. Those extra expenditures stem from the need to recruit bilingual personnel, training existing personnel and developing instructional materials for use at various grade levels in several languages. Additional expenditures also flow from the need to provide bilingual personnel and materials for programs such as special education, occupa *516 tional education and for supportive services such as guidance counselors and social workers. In addition, because the development of a facility in English calls for individual and small group instruction, there is a need for more teaching personnel to achieve more small pupil-teacher ratios thereby adding to the costs of meeting this problem.
The large cities have not been able with their restricted local resources and reduced State aid to develop adequately the English language facility of the large numbers of pupils who speak and read little or no English. As a result, many foreign language pupils have not acquired a facility with English and have performed poorly in their school work.
OCCUPATIONAL EDUCATION STUDENTS
To the other educational overburdens affecting the large city school districts must be added that of the high concentration of occupational education pupils.
In the three up-State cities the enrollment of high school pupils in occupational education in 1974-1975 ran from two to three times greater than in schools located in adjacent suburbs. In the same period New York City had nearly 30,000 high school pupils enrolled in occupational programs which was a higher proportion than was the case in nearby counties.
The need for occupational education was shown to be greater in the large city school districts. More city pupils entered trades and fewer continue on with higher education. When it is available, occupational education has been shown to be a highly effective program. Pupils are motivated to attend school and to achieve learning skills both in occupational training and in the academic area as well.
The costs of providing occupational education constitute an overburden for the large city school districts because they are so much greater per pupil than the costs of providing an academic education. The reasons for such costliness are set forth in the accompanying findings of fact.
The large city school districts, because of their own limited resources and reduced State aid, have been unable to provide occupational education for all the pupils who want it.
STUDENT ABSENTEEISM
The high rates of absenteeism in large city school districts have earlier been discussed in the context of the failure of the *517 State aid formula to take that urban reality into account in measuring fiscal capacity and in arriving at a pupil count for distribution of State aid. The causes of high absenteeism have also been treated in that earlier segment of this decision and in related findings of fact thereby making it unnecessary to repeat them at this point. Absenteeism constitutes a substantial overburden for the large city school districts because of certain effects that flow from it. These include the need to have larger numbers of attendance officers thereby increasing costs; the necessity for teachers to give remedial assistance to absentees when they return in addition to regular ongoing work with those who are in regular attendance; and low achievement levels and failure of pupils attending on an irregular basis often leading to many finally dropping out of school entirely.
Some measure of improvement in attendance in urban school districts can be achieved, but the cost of such improvement is high. Evidence was presented that pupils were motivated to attend school when programs were offered which met their interests and needs such as occupational education, bilingual education and other specially structured programs. Improvement can be achieved if support services are available at a level sufficient to cope with the underlying causes of absenteeism.
While it is possible to manage the problem of absenteeism, the large city school districts with limited local resources and State aid are unable to bring to bear the types of measures that would relieve the burdens of absenteeism and the educational damage that is caused by it.
INADEQUATE RESOURCES TO MEET EDUCATION OVERBURDENS AND THE EFFECT ON PUPIL ACHIEVEMENT
The inability of the large city school districts to cope with the several categories of the educational overburdens has had effects on a great number of pupils that are both serious and tragic. National achievement tests given in large city school districts produced scores showing that substantial numbers of pupils had not acquired even basic minimal educational skills. The failure to acquire such basic skills in lower grades cannot be overcome in high school because of lack of resources at that level. Even if they do not drop out of school, as many do, substantial numbers of pupils remain seriously restricted in their learning as demonstrated on the State’s Pupil Evalúa *518 tion Program (PEP) tests which measure on a State-wide basis the proficiency in reading and mathematics of children in the third, sixth and ninth grades. Pupils scoring below minimum competency are thus identified as "Pupils with Special Educational Needs” (PSEN). The four cities involved in this litigation had far larger percentages of pupils scoring below minimum competency than other areas in 1973. The average percentage of PSEN pupils in the four cities ranged from 25% to 35% higher than in the rest of the State. The percentage of pupils scoring below minimum competency was shown to become greater and the gap between the cities and the rest of the State widened as the pupils went ahead to upper grades. More recent PEP scores indicated the same concentrations of city pupils scoring below minimum competency. These results found confirmation on nationally normed tests.
Severe education underachievement and failure were shown to be compounded as the pupil moved along grade by grade. The later portions of the school curriculum assume that the pupil possesses skills that were acquired at an earlier stage of his educational experiences. If those skills have not been acquired, then the pupil is not equipped to benefit from the educational content of the later offerings.
Effective programs to remedy or alleviate the problems of severe underachievement and failure cost much more money per pupil than the regular educational program because they require substantial numbers of additional personnel. The large urban school districts with limited local resources and reduced State aid are unable to bring effective remedial education to all their underachieving and failing pupils. The evidence has shown that the situation has been worsened by cutbacks caused by local fiscal constraints and diminished Federal funds under title 1 of the Elementary and Secondary Education Act.
THE EFFECT ON EDUCATION AS A WHOLE IN THE LARGE URBAN DISTRICTS OF STATE AID FROM A DISTORTED FORMULA
The intervenors assert that as a result of the State aid formula’s failure to grant them assistance commensurate with their reduced local capacity to finance education and the special overburdens under which they labor all school children in the cities are short-changed. When the cities concentrate resources on pupils with special needs, other pupils, including those who are in fact disadvantaged but not reached by *519 special programs, are subjected to educational deprivation. As concerns educational offerings the city schools have been shown to have among the highest teacher-pupil ratios in the State and a severely constricted variety of elective courses. Many pupils attend classes in buildings which were shown to be in need of repairs and lacking in facilities for counseling, study or recreation. Pupils attending schools in the large cities were shown to be provided with less physical security in their schools; less transportation; restricted sports and extracurricular activity; inadequate library and health services and diminished offerings in art and music. In summary, the failure to provide State aid on an equitable basis deprived the children in the large city districts of an equal education opportunity.
CONCLUSIONS — ORIGINAL PLAINTIFFS’ CASE
FEDERAL EQUAL PROTECTION CLAUSE
In the discussion of the original plaintiffs’ case reference was earlier made to the fact that on the defendants’ motion for summary judgment the original plaintiffs took the position that they were not pressing this claim of a violation of the equal protection provisions of the Fourteenth Amendment to the United States Constitution, but did reserve the right to reassert the claim in the event the United States Supreme Court altered the position taken in the case of San Antonio School Dist. v Rodriguez (411 US 1).
In Rodriguez the Supreme Court refused to find that the Texas school finance system violated the Federal equal protection clause. Subsequent challenges to school finance systems insofar as they have been based on claims of unconstitutionality under the Federal Constitution similar to that of these plaintiffs have been rejected on the authority of the decision in Rodriguez. (Robinson v Cahill, 62 NJ 473, cert den sub nom. Dickey v Robinson, 414 US 976; Serrano v Priest, 18 Cal 3d 728; Horton v Meskill, 172 Conn 615, 376 A2d 359.) Accordingly, the claim of the original plaintiffs of unconstitutionality, to the extent that it has been made on Federal grounds, is rejected.
STATE EQUAL PROTECTION CLAUSE
There is treated next the claim of the original plaintiffs that New York’s school finance system, as to them, violates principles of equal protection of the law under the New York State Constitution (art I, § 11). Selection of a proper standard of *520 review for equal protection analysis is considered first. Three possible standards are urged as appropriate by the original plaintiffs. The first of these is commonly referred to as "the strict scrutiny” standard. This standard of review is appropriately utilized when the alleged discrimination is based on a "suspect category” such as race or gender or when the alleged discrimination impinges on a constitutionally protected "fundamental interest”. The original plaintiffs argue that both these elements are present here and that the strict scrutiny standard is the proper one to be used.
In carrying out its constitutional obligation to provide for the maintenance and support of a system of free public schools, the State long ago elected to delegate a portion of its obligation to local districts who were empowered to generate funds by local real property taxes. As the evidence has shown, the capabilities of districts to raise tax moneys have been influenced by the size of the tax base available for the imposition of tax levies. The development of State aid to public education was made necessary to compensate for the variances among districts in their capacity to provide educational financing. The system for providing funds to finance public education is thus made up of a local component and a State-furnished component. The creation of school districts to aid the State in discharging its obligation was certainly a legitimate option open to the Legislature, and this appears to be recognized by the original plaintiffs. Implicit in the long history of State aid to education has been the State’s recognition that additional financing over and above that generated by local tax revenues was needed in order for the State to discharge its constitutional obligation. It is the end product which has emerged from use of several methods selected by the State to finance public education that is being examined for constitutional compliance. To isolate the division of the State into school districts possessing varying amounts of property wealth and from that circumstance find an impermissible classification according to wealth is not warranted. (See Robinson v Cahill, 62 NJ 473, 492, supra.)
The strict scrutiny standard may be applied if the right to education is a fundamental right entitled to special constitutional protection, in which event the alleged statutory discrimination is examined to determine whether it is required by a compelling State interest. For Federal equal protection purposes education is not a fundamental right. (San Antonio *521 School Dist. v Rodriguez, 411 US 1, supra.) The question then is whether education has a different status for purposes of State equal protection analysis and review. Unlike the situation in Rodriguez, where the court found that education was nowhere mentioned in the Federal Constitution, the education article of New York’s Constitution specifically guarantees a free education to all the State’s children. The historical development of State aid to education in New York, which has already been traced both before and after the adoption of an education clause as part of the State’s Constitution in 1894, renders difficult any conclusion other than that education is an interest of great State importance. The evidence in this case has shown education to be the single largest activity in which State government engages. Nevertheless, whether education is in New York such a fundamental interest as to invoke special constitutional protection has been called in question by language appearing in Matter of Levy (38 NY2d 653, 658) where it was stated: "Nor is the right to education such a 'fundamental constitutional right’ as to be entitled to special constitutional protection (San Antonio School Dist. v Rodriguez, 411 US 1, 16).” The defendants argue that Matter of Levy precludes use of the strict scrutiny standard of review because education is not a fundamental interest. The original plaintiffs, while conceding that the language employed in Matter of Levy can be read as supporting defendants’ position, urge that the statement should be regarded as dictum because, they assert, the right to education was not at issue in that case. This court is not persuaded that Matter of Levy can be distinguished on that ground. It is true, as the original plaintiffs have pointed out, that the Attorney-General’s brief in Matter of Levy contained references to the effect that when the Legislature enacted special provisions for the education and maintenance of blind and deaf children, it did so as "an act of public charity” permitted by the provisions of section 8 of article VII of the State Constitution, rather than in fulfillment of the State’s obligation to educate its children (art XI, § 1). The fact remains, however, that Matter of Levy concerned the right to education. The court recognized (p 657) that a "handicapped child has a right to a free education in the State of New York” under the education clause of the State Constitution. The issue confronting the court was the constitutionality of legislative enactments which, on the one hand, provided wholly free education (including all maintenance expense) for blind and deaf children, while at the same *522 time providing free education to other handicapped children except for maintenance costs to which parents could be ordered to contribute. The statutory differentiation was challenged as a denial of equal protection of the law under both Federal and State constitutional provisions. To the extent that the case concerned alleged unconstitutional discrimination caused by statutory classifications for purposes of determining whether a handicapped child received a wholly free education or something less than a wholly free education, it may be regarded as an education case and not merely one dealing with the maintenance component of education. It is believed that it was in the context of a handicapped child’s right to education that the court approached the selection of an appropriate standard of equal protection review and made its comment that "the right to education” was not such a fundamental constitutional right as to be entitled to special constitutional protection. Having already ruled out handicapped children as a "suspect classification” the court found that the strict scrutiny test was not the appropriate standard of review and applied the rational basis test under which it found no constitutionally impermissible classification.
This court regards Matter of Levy as authority for the position that the right to education is not such a fundamental constitutional right as to invoke special constitutional protection by use of the strict scrutiny standard of equal protection review.
A second standard of review which has received judicial approval for use under appropriate circumstances is the so-called "sliding scale” test which lies somewhere between the strict scrutiny standard at one extreme and the rational basis test at the other. (Cf. Montgomery v Daniels, 38 NY2d 41, 61.) That this is a proper test has been established in Alevy v Downstate Med. Center (39 NY2d 326). As explained in Alevy (p 336), the first step in the sliding scale analysis is to determine whether the challenged discrimination "satisfies a substantial State interest.” The discriminatory treatment must be examined to see whether it has a "substantial basis in actuality, and is not merely conjectural.” The statutory scheme alleged to be discriminatory must at least "further some legitimate articulated governmental purpose.” If it is found that a substantial State interest is served by the discriminatory scheme, a "further inquiry must be made as to *523 whether the objectives being advanced by the policy could not be achieved by a less objectionable alternative”.
The State interest or interests which the statutory plan is designed to satisfy must first be identified. The overarching interest here is the State’s obligation to "provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated.” (NY Const, art XI, § 1.) This encompasses the further State interest of affording all school children of the State equal educational opportunities in the elementary and secondary schools. State aid legislation is intended to serve the additional purpose of remedying inequalities in such educational opportunities that would exist because of lack of local resources unless the State furnished financial assistance.
The statutory plan for providing State aid has been shown by the evidence to operate unequally and to have a discriminatory impact on clearly identifiable segments of the pupil population of the State. Real property taxes levied by independent school districts provide about 60% of the funds needed to support their schools. The remaining 40% is money generated by State appropriations under the State aid formula and under a variety of categorical programs. The more than 700 school districts throughout the State vary greatly in the amounts of real property wealth located within their boundaries and serving as the base for school tax levies. It is the full value of real property per resident pupil in weighted average daily attendance which the State aid formula uses as the measuring device to determine school district wealth and fiscal capacity for all major components of State aid except that of transportation. Under all major State aid formulas, funds are apportioned among school districts on the basis of relative real property wealth.
The markedly unequal distribution of real property value among the State’s school districts means a correspondingly unequal access to taxable real property wealth. This, in turn, means that the imposition of any given tax rate to such widely differing tax basis necessarily yields disparate revenues per pupil.
The evidence has demonstrated a wide variation in operating expenditures among the State’s school districts. The original plaintiffs presented evidence showing a strong relationship between the disparities in the distribution of taxable real property wealth and the disparate levels of local expenditures. *524 This strong connection between the patterns of real property wealth and expenditures was not controverted by the defendants. The connection between district wealth and district expenditures is not fortuitous or coincidental. It is the nature of the State aid formula itself which makes it highly probable that districts with greater property wealth will spend more per pupil than their poorer counterparts. The built-in factor that causes this probability is the express linkage of district property wealth and district spending in the statutory formula. Specifically, the formula assumes a hypothetical spending norm of $1,200 per pupil and provides State aid to districts to raise the funds necessary to reach that spending level provided the districts levy the same 15 mill tax. Thus, wealthier districts have been able to raise substantially more than $1,200 by imposing tax rates lower than 15 mills. But, districts relatively poor in property wealth, though imposing sharply higher tax rates, have not been able to achieve the spending levels of the wealthier districts or even average levels of spending. In earlier portions of this decision and the accompanying findings of fact, note has been taken of the significant consequences that flow from the inability of property-poor districts to attain the spending levels of property-rich districts. They include differences in tax burden, professional staff ratios, class size, curriculum offerings, teacher characteristics, services available to pupils and the availability of equipment and supplies.
The evidence has shown that the State aid formula operates in a way that discriminates against components of the class of persons affected by the State aid system. That being so, it is necessary to inquire whether the objectives and purposes underlying the State aid system can be achieved by a less objectionable alternative (Alevy v Downstate Med. Center, 39 NY2d 326, 336, supra).
Since the decision in Rodriguez, there has been a significant advance in the development of revised methods of funding public education. (See Horton v Meskill, 172 Conn 615, 642, n 12, supra.) In the case last cited the court noted that since 1973 the Legislatures of 19 States had enacted educational finance reforms. The development and use of revised methods of educational finance were described by several witnesses during the trial. Not only have those witnesses testified to the availability of alternative techniques considered by them as susceptible to being fashioned to suit *525 the needs of New York’s educational system, but evidence was also presented that alternatives to the present system have been studied and analyzed by special committees, task forces, the Regents of the University of the State of New York, and various consultants who have made specific proposals for change in the challenged system so as to lessen the present inequities.
It is not the desire or intent of the court to express an opinion about the suitability, desirability or the constitutionality of any of the various techniques concerning which evidence was adduced at the trial. Mention of their existence is made solely for the purpose of indicating that there exists a body of knowledge that is available for consideration by the Legislature concerning methods different from what is currently employed, leaving to that body the determination of what best suits the needs of New York.
This court concludes that measured by the standards of the so-called sliding scale approach, New York’s current system of providing State aid to public elementary and secondary education denies the original plaintiffs equal protection of the law under the provisions of section 11 of article I of the New York State Constitution.
The defendants take the position that for purposes of equal protection analysis, the proper standard of review is the so-called rational basis test. The claim of impermissible discrimination is next reviewed according to that standard. When the rational basis test is used, it must be shown that the alleged discrimination is justified because it is rationally calculated to further legitimate objectives (Matter of Patricia A., 31 NY2d 83, 88). The test was succinctly described by then Chief Judge Fuld in Matter of Patricia A. (p 88, supra) as follows: "Discrimination by the State between different classes of citizens must, at the very least, 'have some relevance to the purpose for which the classification is made.’ (Baxtrom v. Herold, 383 U.S. 107, 111; see, also, Stanley v. Illinois, 405 U.S. 645; Eisenstadt v. Baird, 405 U.S. 438; Reed v. Reed, 404 U.S. 71, 76; Matter of Jesmer v. Dundon, 29 N Y 2d 5, 9; Seidenberg v. McSorley’s Old Ale House, 308 F. Supp. 1253; Sail’er Inn v. Kirby, 5 Cal. 3d 1; Matter of Louise B., 68 Misc 2d 95). Phrased somewhat differently, the classification ' "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circum *526 stanced shall be treated alike.” ’ (Reed v. Reed, 404 U.S. 71, 76, supra.)” The question then is whether the disparate treatment of school districts (and consequently the pupils therein) under the challenged legislation is warranted because such treatment bears a reasonable relation to the achievement of legitimate objectives.
Earlier, in discussing the purpose of the State aid system, it was noted that the objective is that of providing a method of remedying inequalities in the right to educational opportunities which would exist in the absence of intervention by means of State aid. The lack of rationality in the present system is delineated in thé findings of fact and needs only summary comment here.
The State provides elementary and secondary education by means of schools in the more than 700 school districts. Their boundaries are today arbitrarily defined, even though in years past there may well have been good reasons for their establishment. Wide variations in taxable real property wealth are found among the districts. School taxes locally levied upon those disparate tax bases are the principal source of funds to finance operation of the district schools. The same real property bases are subject to taxes levied by other governmental units to finance their needs. School districts, such as those included among the original plaintiffs, despite high taxes levied on their lower-valued tax bases are unable to achieve the levels of educational expenditures attained by school districts with higher-valued tax bases through the levy of lower taxes. The availability of greater local revenues with less tax effort in districts with greater property wealth, plus additional funds from State aid, enables them to provide their pupils with meaningful educational opportunities not realistically available to pupils in districts with lesser property wealth.
While the intent and purpose of State aid is to correct and overcome such inequities, the operative effect of the challenged State aid formula has been to perpetuate them. That effect has been shown by the- evidence to be produced by several factors. One of these is the use of a complex formula which in its application is made to operate as a function of the property wealth of the school districts. An additional factor is the continued distribution of flat grants, even to school districts having the greatest property wealth. A third factor operating to negate the purpose of correcting inequities in the *527 blanket use of so-called "save-harmless” provisions in the statutory scheme which render inoperative details of the State plan.
A rational basis for discriminatory treatment is not established, as the defendants have sought to do, by isolating components of the State aid scheme and urging that individually they bear a substantial relation to the statutory purpose. It is the totality of the formula and its operative effect that have been challenged rather than the rationality of any discrete element. The evidence amply supports the conclusion that the plenary operation of the State aid formula does not bear a rational relation to the objectives for which it was devised. It is the irrationality of the manner in which the State aid system actually operates that causes it to fail the rational basis test for compliance with equal protection requirements of the State Constitution.
THE EDUCATION ARTICLE
Section 1 of article XI of the New York Constitution provides: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated”. The original plaintiffs claim that the State has failed to meet its obligation under the foregoing provision.
The education article imposes on the State the obligation to assure to each school child an educational program that is appropriate to that child’s need (see Matter of Downey, 72 Misc 2d 772; cf. Matter of Levy, 38 NY2d 653, 657-658, supra). The primary obligation to establish and maintain a system of free public schools is that of the State (see 3 Lincoln, Constitutional History of New York, p 554). In discharging that obligation it lies within the prerogatives of the Legislature to select a method suitable to achieve the constitutional objective. For that reason this court does not accept the claim seemingly made by the original plaintiffs that the delegation of responsibility to school districts to generate a substantial portion of educational funds from their own resources constitutes "an abdication of responsibility.” Such a position inaccurately describes the real issue. Indeed, the original plaintiffs appear to recognize this in their "Post-Trial Memorandum of Law” where it is stated: "Whether the legislature chooses to run a centrally managed system out of Albany, or to delegate responsibility to artificially created school districts well may *528 be a permissible option. What cannot be delegated by the legislature, however, is responsibility for the end product.” The Supreme Court of New Jersey in construing that State’s constitutional provision for free schools, one which is similar but not identical to New York’s, described the State’s obligation in these terms: "The obligation being the State’s to maintain and support a thorough and efficient system of free public schools, the State must meet that obligation itself or if it chooses to enlist local government it must do so in terms which will fulfill that obligation.” (Robinson v Cahill, 62 NJ 473, 509, supra.) With further reference to the scope of the obligation, the New Jersey Supreme Court stated (p 513): "Whether the State acts directly or imposes the role upon local government, the end product must be what the Constitution commands. A system of instruction in any district of the State which is not thorough and efficient falls short of the constitutional command. Whatever the reason for the violation, the obligation is the State’s to rectify it. If local government fails, the State government must compel it to act, and if the local government cannot carry the burden, the State must itself meet its continuing obligation.”
In light of the foregoing it is seen that it is not the fact that, in attempting to fulfill the constitutional obligation, the State has delegated taxing responsibility to school districts which offends the education article. Rather, it is the fact that such delegation has been made without adequate recognition of the varying capabilities of districts to raise educational funds through taxes levied on disparate real property tax bases and the failure of the State to correct disparities in the availability of locally raised educational funds by providing State aid sufficient to discharge its primary obligation.
The manner in which the challenged system has been shown to operate has been summarized in previous portions of this decision and described in detail in the findings of fact. It would serve no useful purpose to repeat such matter here. It is sufficient to state that on the evidence adduced, the manner in which the State has been shown to provide funds for the "maintenance and support of a system of free common schools” fails to meet the obligation imposed by section 1 of article XI of the New York Constitution.
The court emphasizes that in so concluding, it is not to be understood as having labelled as constitutionally impermissible the State’s use of local school districts in providing a *529 system of free public schools. Nor is the court to be understood as ruling that the use of locally imposed real property taxes is constitutionally unacceptable.
CONCLUSIONS — PLAINTIFFS-INTERVENORS’ CASE
EQUAL PROTECTION OF THE LAW
The plaintiffs-intervenors claim that the State aid formula denies them equal protection of the law in violation of section 11 of article I of the New York Constitution. The principle of equal protection of the law does not prohibit the State from treating different classes of persons in different ways. Statutory classification for purposes of according different treatment, however, must rest upon a reasonable rather than an arbitrary basis and be founded upon a difference that bears a fair and substantial relation to the purpose of the statute in order that all persons who are similarly situated are treated in the same way (Matter of Patricia A., 31 NY2d 83, 88, supra).
A major purpose underlying State aid for public education in New York, historically and under the 1974 statute here challenged, has been that of equalizing the varying capabilities of the State’s school districts to finance public education. That purpose in turn, serves the objective of providing equal educational opportunity for all the school children of the State.
The State aid statute purports to equalize the disparate fiscal capabilities of the State’s numerous school districts, including those located in large cities. It has been formulated in such a way, however, that when applied to the large city school districts, their capacity to finance public education with local resources has been overstated. This distortion is caused by applying to the large city school districts the same yardstick of fiscal capacity as is applied to nonurban school districts without giving adequate effect to certain overburdening conditions that affect the large cities and the schools located within their boundaries. By the use of a flawed measure of fiscal capacity, the large cities are made to appear as possessing greater capability to finance their schools than is actually the case. Having been shown by the measurements of a flawed formula to be less in need of financial help, the large city school districts receive less State aid.
The plaintiffs-intervenors have established by evidence that *530 has not been contradicted that the large cities labor under the following major school finance overburdens:
The drain on large city tax dollars caused by the need to provide an enormous amount of noneducational services; the diminished value of the dollar allocated to city school purposes; the increased school costs caused by the far higher rates of student absenteeism prevailing in large city schools; and the increased costs caused by the far greater concentrations and numbers of disadvantaged, handicapped and other students with special needs. While the State aid statute on its face purports to accord equal treatment to all school districts, its failure to give effect to the overburdening factors affecting large city school districts has resulted in overstating the capacity of such districts to finance public education and thereby classifying them as less deserving of State aid. Such a classification bears no reasonable relation to the statute’s purpose of providing State aid to districts in proportion to their need. Because the State aid statute has been shown to operate in that way, it has in its operational effect created a classification which as to the plaintiffs-intervenors lacks a rational basis and is discriminatory. It must be found therefore to constitute a denial of equal protection of the law and a violation of section 11 of article I of the New York Constitution.
 The plaintiffs-intervenors have also based the claim of denial of equal protection of the law on the provisions of the Fourteenth Amendment of the Federal Constitution. In the case of San Antonio School Dist. v Rodriguez (411 US 1, supra), the Supreme Court upheld the constitutionality of the Texas school finance system. In doing so, it considered the claim that the finance system violated the Federal equal protection clause and rejected it after applying the "rational basis” as the standard for equal protection review. The question that must be resolved is whether the decision in Rodriguez has foreclosed a claim by plaintiffs-intervenors for denial of equal protection under the Fourteenth Amendment. It is important to note that the equal protection coverage afforded by the State equal protection clause has been construed as being the same as that under the Federal equal protection clause. (Dorsey v Stuyvesant Town Corp., 299 NY 512, cert den 339 US 981.) The Federal equal protection clause, like its New York counterpart, permits the State to legislate different kinds of treatment to different classes of persons provided that *531 the classification is not arbitrary but made on a reasonable basis so that all those in similar circumstances are treated alike. (Reed v Reed, 404 US 71, 76.) A State statute may not prescribe different treatment for persons it places in different classes on the basis of criteria that are unrelated to the purpose sought to be achieved by such statute (Reed v Reed, pp 75-76, supra; Johnson v Robison, 415 US 361, 374-375). The breadth of equal protection coverage being the same under State and Federal equal protection clauses, it follows that a finding that the statute in this case denies equal protection to the plaintiffs-intervenors under the State Constitution should require a like finding under the Federal Constitution unless barred by the decision in Rodriguez. In this court’s view, Rodriguez does not bar such a finding. What was decided in Rodriguez was that on the facts presented and using a rational basis standard of Federal equal protection review, the Texas school finance system did not deny the plaintiffs equal protection of the law under the Fourteenth Amendment. It is true that in determining what was the appropriate standard of review for equal protection analysis, the majority rejected the strict scrutiny test upon the ground that "wealth” was not a suspect category and that education was not a fundamental interest protected by the Federal Constitution. The fact that the court refused to apply the strict scrutiny test in Rodriguez does not mean that an educational statute’s compliance with the Federal equal protection standards cannot be tested by a less rigorous standard of review. That is precisely what was done in Rodriguez. A similar course was followed by the Court of Appeals in Matter of Levy (38 NY2d 653, supra). In that case the court was called upon to determine whether section 234 of the Family Court Act violated the Federal and State equal protection clauses by authorizing the New York City Family Court to require parents of handicapped children, other than children who are blind or deaf, to contribute to the maintenance of such children in connection with their education. The court, citing the education clause of the New York Constitution, the Education Law and decisional precedent, held (p 657) that "a handicapped child has a right to a free education in the State of New York.” In making its threshold determination as to the applicable standard of review of the equal protection claim made under both Federal and State equal protection clauses, the court held that handicapped children, as such, did not constitute a "suspect classification.” It also held, citing Rodriguez, that the right to education, *532 recognized both by State Constitution and statute, was not such a "fundamental constitutional right” as to be entitled to special constitutional protection. The court accordingly rejected the strict scrutiny test and adopted the rational basis test as the proper standard of review. Applying that standard, the court found that the differentiation between classes of handicapped children rested on a rational basis and did not offend equal protection principles. Thus, it is seen that while Rodriguez has been followed in New York as authority for the proposition that the right to education is not such a fundamental constitutional right as to invoke special constitutional protection through a strict scrutiny standard of review, it has not precluded the Court of Appeals from considering an equal protection claim founded in part on the Federal clause by use of the rational basis test.
In the case of the plaintiffs-intervenors, their claim of denial of equal protection is based on discrimination in the operation of the State aid formula which bears no reasonable relation to the purpose of the statute. Using the rational basis test the court has found that the State aid statute in its operational effect created a classification which as to the plaintiffs-intervenors lacked a rational basis and was discriminatory, thereby constituting a denial of equal protection of the law under the New York Constitution. For the same reasons, there is a denial of equal protection of the law under the Fourteenth Amendment.
EDUCATION CLAUSE
In its discussion of the education clause of the New York Constitution (art XI, § 1) and its application to the claims of the original plaintiffs, the court stated that such provision imposes on the State the obligation to assure to each school child an educational program that is appropriate to that child’s needs (see Matter of Downey, 72 Misc 2d 772, supra; cf. Matter of Levy, 38 NY2d 653, 657-658, supra). Recent decisions that have considered provisions in the constitutions of other States similar to but not identical with New York’s education clause have interpreted them as guaranteeing equal educational opportunity for school children in such States (see Robinson v Cahill, 62 NJ 473, 513, cert den sub nom. Dickey v Robinson, 414 US 976, supra; Horton v Meskill, 172 Conn 615, 647-651, supra).
Viewed in the light of New York’s long historical concern *533 for providing free education to its school children, the education article must be regarded as also guaranteeing to all the children of the State an equal opportunity to acquire basic minimal educational skills. (Report of the Commission on Common Schools [1812]; Report of the Select Committee on the Petitions for the Amendment or Repeal of the Free School Law [1850]; Report of the Special Joint Committee on Taxation and Retrenchment, Legis Doc [1925] No. 97.) A like interpretation has been given New Jersey’s comparable constitutional provision by that State’s Supreme Court: "The Constitution’s guarantee must be understood to embrace that educational opportunity which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market.” (Robinson v Cahill, supra, p 515.)
Many pupils in the large urban school districts of the State fail to acquire basic minimal educational skills while attending schools in such districts. There are many pupils in those districts who fail to achieve minimum levels of competence as measured by State standards.
Despite the fact that the large city school districts have grossly disproportionate numbers and concentrations of pupils who are deficient in basic skills, the State aid system provides them with reduced aid per pupil and reduced aid per special needs pupil. The formulation by which aid is provided is intended to assure equal educational opportunity throughout the State by distributing aid in proportion to a particular district’s need. Where it is demonstrated that there is a greater need, it follows that a greater amount of aid must be furnished if equal educational opportunity is to be available. Something more than average aid to school districts must be furnished to accomplish that goal. A failure to do so not only means not achieving such goal but is tantamount to excluding those many under-achieving pupils from the educational program.
The education article raised to constitutional stature a longstanding major objective of New York’s free public school system, namely, to give to all the State’s school children the opportunity to acquire at least those basic skills necessary to function as a citizen in a democratic society. That objective found expression in the Report of the Commission on Common Schools (1812) where it was stated (p 720): "In these schools should be taught, at least, those branches of education which *534 are indispensably necessary to every person in his intercourse with the world, and to the performance of his duty as a useful citizen. Reading, writing, arithmetic, and the principles of morality, are essential to every person, however humble his situation in life.” (Emphasis supplied.)
By providing reduced aid per pupil and reduced supplemental aid per special needs pupil to the large city school districts and by failing to take into account adequately their major education overburdens, including their large numbers of pupils lacking basic minimal educational skills, the State aid formula violates section 1 of article XI of the New York State Constitution.
EQUAL PROTECTION AND EQUAL EDUCATIONAL OPPORTUNITY
In the preceding segment it was shown that by providing less aid to large city school districts with the largest education overburdens there was a violation of the education clause. At this point it is demonstrated that there is an equal protection violation as well because of the resulting denial of equal educational opportunity.
The Supreme Court in Rodriguez noted (411 US 1, 37, supra) that on the record it had before it the claim could not be made that the Texas school finance system failed "to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process.” The inference to be drawn from that statement appears to be justified that if there had been a showing of such "absolute deprivation” the court would have felt justified in finding an equal protection violation. It is interesting to note that in a subsequent decision the Supreme Court found that teaching Chinese-speaking pupils only in English denied such children "a meaningful opportunity to participate in the educational program”. (Lau v Nichols, 414 US 563, 568.) Although a violation of the Federal equal protection clause was argued in Lau, the Supreme Court chose not to reach that argument, resting its decision on a section of the Civil Rights Act of 1964 which forbade discrimination based on the ground of race, color, or national origin. Accordingly, reference to Lau is not made to directly support an equal protection argument here, but rather to illustrate the point that the Supreme Court has recognized that equality of treatment is not achieved under State-imposed standards *535 "merely by providing students with the same facilities, textbooks, teachers, and curriculum; for students who do not understand English are foreclosed from any meaningful education.” (Lau v Nichols, p 566, supra.)
While it was unnecessary for the court to reach the equal protection claim in Lau because of specific provisions in a Federal statute and regulations implementing the same, the case is important as indicating that when substantial numbers of pupils are deprived of "a meaningful opportunity to participate in the educational program” of a public school system there is discrimination. In Lau the discrimination was rooted in the failure to provide ways and means to give English language skills to non-English-speaking pupils. Here discrimination is found in the fact that large numbers and concentrations of pupils in large urban school districts, seriously deficient in basic minimal educational skills are denied an opportunity for meaningful participation in the educational program. It is the position of the intervenors that it is the proven educational failure rates of pupils in the big city school districts that warrant invoking equal protection principles.
The Supreme Court has observed that "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike” (Jenness v Fortson, 403 US 431, 442). If equal treatment of unequals is discriminatory, then providing less favorable treatment of unequals has to be regarded as even worse discrimination. The State aid statute in failing to give effect to the inordinate education overburdens of the large city school districts and as a result providing them less assistance operates in a discriminatory fashion and violates the requirements of equal protection of the law under both section 11 of article I of the New York State Constitution and the Fourteenth Amendment to the United States Constitution.
THE RELIEF
It is appropriate at this point to comment on the matter of the relief that may properly be granted to both groups of plaintiffs in this litigation.
The primary relief sought by the original plaintiffs is a judgment declaring that the State’s system for financing public schools is invalid on constitutional grounds. Those plaintiffs request that the court retain jurisdiction of the action for a period of time in order that the Legislature may fashion a constitutional system. In the event that the Legislature fails *536 to do so, the original plaintiffs ask that the court enjoin the continuation of the system declared constitutionally invalid.
The primary relief sought by the plaintiffs-intervenors is that of a judgment declaring that the State’s system for providing State aid to them is unconstitutional. In addition, they ask that the court issue a direction to the Legislature to "make corrections in the state operating expense aid formula to overcome the defects thus declared.” The balance of the relief sought by the plaintiffs-intervenors includes a request for the court to retain jurisdiction of the action for a period of time to permit enactment of modified State aid provisions that are constitutional, Failing such enactment, they request that the court redirect State funds to school districts on an interim basis.
It is the proper function and duty of the judicial branch of government to render a judgment declaring whether a statutory plan is in compliance with constitutional requirements. It is equally the proper function and duty of the legislative branch to devise a State educational finance system that is constitutional. That is the command of the education article of the New York Constitution (art XI, § 1). There exists a considerable body of knowledge developed in recent years upon which other States have drawn in revising their systems for financing public education. In New York those who have studied its system have made recommendations for change. Proposals for revision in New York have come from consultants, special commissions and members of State government. With that in mind, this court has deemed it necessary to refrain from expressing an opinion as to the appropriateness of any particular means or technique for attaining a suitable school finance system in this State believing that "the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them” (San Antonio School Dist. v Rodriguez, 411 US 1, 59, supra).
The Legislature must be afforded an opportuntiy to develop a suitable plan for the revision of the State’s system of financing public education. (See Horton v Meskill, 172 Conn 615, —, 376 A2d 359, 375, supra; cf. Brown v Board of Educ., 349 US 294, 301.) It is a well-established principle that even though a litigant has been declared to have a legal right, courts should not grant relief in a manner likely to produce disorder and confusion in public affairs (Matter of Andresen v Rice, 277 NY 271, 282; Matter of Madden v Reavy, 284 NY *537 418, 422). This principle has been invoked in more recent times in connection with determinations affecting governmental affairs. (See Matter of Hellerstein v Assessor of Town of Islip, 37 NY2d 1, 13-14, mod 39 NY2d 920 [real property assessment]; Flushing Nat. Bank v Municipal Assistance Corp. for City of N. Y., 40 NY2d 731, 741 [New York State Emergency Moratorium Act for City of New York].)
Accordingly, the court’s conclusion that each group of plaintiffs is entitled to judgment declaring the challenged school finance system unconstitutional shall have prospective operation only. Such declaration, however, shall not prevent the continued operation of the State’s school system under existing statutes nor invalidate past or future obligations incurred for the operation of the school system 'pursuant to applicable statutes which shall continue in effect until changed by legislative action or until such time as operations under them are specifically enjoined by the court. (See Robinson v Cahill, 118 NJ Super 223, 280-281, mod and affd 62 NJ 473, cert den sub nom. Dickey v Robinson, 414 US 976; cf. Horton v Meskill, 172 Conn 615, 649-650, supra.)
The court will retain jurisdiction of the action but otherwise withhold judicial intervention to afford the Legislature the opportunity to take appropriate action.
An appropriate judgment shall be settled on notice. Specific provisions shall be included in the judgment to permit the continued operation of the State’s school system under existing statutes and to assure the validity and enforceability of past and future acts and obligations incurred under applicable statutes as long as they remain operative.
COMMENT
The court expresses its appreciation to all the attorneys who had a role in the presentation of this case during and after trial.
They are commended for the thoroughly professional manner in which the case was tried and for the comprehensive posttrial submissions which reflected great diligence and effort.
For their consistently co-operative and courteous relationship with the court, all counsel have its sincere thanks.