Fuchsberg, J.
(dissenting). I believe the sad record of this case demonstrates that in material manner the public school system of New York State, to which falls responsibility for the education of well over three million children, does not rise to the level dictated by a realistic reading of the State constitutional mandate for the “maintenance and support of a system of free common schools, wherein all the children of this state may be educated” (NY Const, art XI, § 1 [emphasis added]).
Justice L. Kingsley Smith of the State Supreme Court, after presiding over the 122-day trial at which this matter was exhaustively explored, found that it failed to do so (94 Misc 2d 466). Justice Leon D. Lazer, writing on this point in a painstaking and penetrating opinion for the Appellate Division, came to the same conclusion (83 AD2d 217, 219). Concurring in this view, Justices James D. Hopkins and Moses M. Weinstein each emphasized his position by writing separately to this effect. Nor did the recent Report and Recommendations of the distinguished official New York State Special Task Force on Equity and Excellence in Education, whose independent inquiry was precipitated by the findings in this case, arrive at a different appraisal. And Governor Hugh L. Carey’s Elementary and Secondary School Message, delivered to the current session of the Legislature on February 17, 1982, was in the same vein.
In this connection, it is worthy of special note, in a world where life and law must not live in separate compartments, that the Governor, responding to the decrees of the afore-mentioned courts, and quoting the Task Force’s statement that “in the education of children, the demands of morality are as compelling as the commands of legality”, recommended a five-year program to “make equal education opportunity a reality”.
*51 But the majority of this court, though compelled to accept the now affirmed “careful and detailed factual determinations * * * made by both courts below”, insists that “the constitutional requirement is being met in this State”. Doing so, it also rejects the lower courts’ conclusion that the disparities and discriminations produced by our property-oriented educational finance system offends the equal protection guaranteed by our State Constitution (art I, § 11).[1] For the reasons which follow, my disagreement is on all counts.
At the very outset of my analysis, I put at issue the majority’s assertion (majority opn, at p 43, n 5) that the inclusion of the education article in our State Constitution, far from carrying the weight of a like insertion in the Federal Constitution, where it has no counterpart, may have little more significance than would a mere “statutory articulation”. I would think that a far more likely theory, consistent with our Federal form of Government, is that primary concern for education was to be that of the States rather than of the Union and that the article’s placement in the State Constitution was all the more crucial in the context of the pluralistic political process of which the Tenth Amendment speaks (US Const, 10th Arndt).
In any meaningful ordering of priorities, it is in the impact education makes on the minds, characters and capabilities of our young citizens that we must find the answer to many seemingly insoluble societal problems. In the long run, nothing may be more important — and therefore more fundamental — to the future of our country. Can it be gainsaid that, without education there is no exit from the ghetto, no solution to unemployment, no cutting down on crime, no dissipation of intergroup tension, no mastery of the age of the computer? Horace Mann put it pragmatically that education is not only “the great equalizer of men”, but, by alleviating poverty and its societal costs, more than pays for itself. So, too, only this past week, the Supreme Court of the United States reminded us that *52 it had recognized the public school “as the primary vehicle for transmitting the values on which our society rests” (Plyler v Doe, 457 US 202).
Even more pointed is how the sponsors of the education article perceived it. The spokesman for the unanimous Education Committee of the Constitutional Convention which immediately preceded the one at which the article was adopted, reported it in these words: “If there is any thing that should be constitutionalized because of its great importance, it is the all-important, overriding interest of education. Sir, I regard it as being paramount to every other interest in this State. I regard this article as being more important to the people of the State, to every man, woman and child in the State, than any other article that has been under consideration in this Convention” (1867-1868 NY Constitutional Convention, 4 Proceedings & Debates, p 2856).[2]
Though an unrelated political controversy foreclosed any amendment of the State Constitution that year, when it next was amended, in 1894, the article as we know it today was adopted on a report which apparently had net retreated a bit from the position that “[t]here seems to be no principle upon which the people of this commonwealth are so united and agreed as this, that the first great duty of the State is to protect and foster its educational interests” (1894 NY Constitutional Convention, Doc No. 62, p 3). The report went on to note (at p 4), “that within the last half century of constitutional revision no other State of the Union has considered it superfluous or unwise to make such an affirmation in its fundamental law” and that the article “requires not simply schools, but a system; not merely that they shall be common, but free, and not only that they shall be numerous, but that they shall be sufficient in number, so that all the children of the State may, unless otherwise provided for, receive in them their education. No desire to confine the new Constitution to the *53 narrowest possible limits of space should prevent the adoption of an enactment declaring in the strongest possible terms the interest of the State in its common schools”.[3]
It is in juxtaposition to this contemporary commentary by the fathers of our education article, which, revealingly, came to be known as “the children’s Bill of Rights” (2 Lincoln, Constitutional History of New York, p 206), that a sampling of the facts regarding the actual impact of the system as it now exists should be examined. For this purpose, we may well quote from the Appellate Division’s excellent synopses, first, as to the four intervenor cities (Syracuse, Rochester, Buffalo and New York City) and, second, as to the many individual districts who initiated this suit.
The plight of the cities, found to be attributable to the inexorable drain of a municipal overburden[4] left unremedied by a State aid formula tied to realty resources, is at once seen in the findings that they:
“spent 28% of their tax revenues on education while jurisdictions outside the cities spent 45% * * * [and that the] huge concentration of poverty stricken gave New York City 47% of the State’s pupils with special educational needs, although it had only 31% of the total public school population and received only 26% of the State’s education operating aid. * * * [Trendwise], [b]y 1980-1981 New York City’s percentage of the State’s special needs pupils had risen to 51% as against 33% of the public school enrollment and 29% of education operating aid.

% % %:

*54 [Furthermore], “[t]he State’s reliance on attendance rather than enrollment figures results in a double financial penalty to the cities because of their high rates of absenteeism. * * * Because the high absentee rate is a direct consequence of poverty and underlying social conditions, its effects are inexorable and its financial effects cannot be alleviated by employment of additional attendance officers.
“The significantly higher proportion of physically, mentally and emotionally handicapped and learning impaired pupils resident in the cities and the extra personnel required to administer necessary programs compel the expenditure of greater sums to educate them. While the State aid formula provides additional weightings for handicapped students, the computation is flawed by a failure to account for municipal overburden, reduced purchasing power of city educational dollars, and high absentee rates.
* * *
“Reduced aid to the cities also impairs their abilities to instruct students who speak little or no English, although such programs are required under Federal mandate. * * * [Also] the cities have the highest concentration of occupational education students * * *. Because of their large numbers and the greater expense of the programs offered, city school districts are unable to accommodate all students requesting occupational education.
* * *
[Indicative of both inferiority and inequality], “results of national, State and local achievement tests demonstrate that unconscionable numbers of children fail to acquire basic educational skills. In Rochester, standardized tests given in 1975 revealed that 45% of the secondary school students were ‘educationally disadvantaged’ — that is, not performing at grade level and at least two years or more *55 below level in reading — as were 58% of those students in mathematics; 16% of Rochester’s twelfth grade students read fifth grade level or below. In a 1976 New York City test, 12% of the ninth grade students were found to read at fourth grade level or below. * * * These percentages translate into many thousands of high school children, some of whom are totally illiterate while others can read the words without accompanying comprehension and still others cannot apply the meager information they can obtain to problems.” (83 AD2d, at pp 229-232).
The Trial Judge’s summary is apt: “When the cities concentrate resources on pupils with special needs, other pupils, including those who are in fact disadvantaged but not reached by special programs, are subjected to educational deprivation * * * Many pupils attend classes in buildings which were shown to be in need of repairs and lacking in facilities for counseling, study or recreation. Pupils attending schools in the large cities were shown to be provided with less physical security in their schools; less transportation; restricted sports and extracurricular activity; inadequate library and health services and diminished offerings in art and music. In summary, the failure to provide State aid on an equitable basis deprived the children in the large city districts of an equal education opportunity” (94 Misc 2d, at pp 518-519).
Now, as to the nonintervening plaintiffs, while their problems may not be compounded by municipal overburden, they suffer from a qualitatively, if not, quantitatively related malaise produced by a daunting and difficult finance system so onerous in its effect on districts poor in realty wealth (see 83 AD2d 217, esp at pp 223-226) and so complex in its application that Justice James D. Hopkins, concurring in the majority’s finding that the State is violating the State Constitution’s education article, felt called upon to complain that “the design of a uniform and harmonious system conceived by its nineteenth century authors had been frustrated and distorted” into “a veritable jungle of labyrinthine incongruity”, “an Ossa of confusion piled on a Pelion of disorder”. (83 AD2d, at p 269.) In everyday terms, the net result is illuminated again by the Appellate Division’s recitation, this time that:
*56 “The disparities in operating expenditures per pupil in 1974-1975 ranged from $4,215 for the richest district to $936 for the poorest, a ratio of 4.5 to 1 * * * Three districts in Suffolk spent more than $6,300 and four spent less than $2,300 while the ratios between some districts in Nassau and Albany Counties reached 2 to 1. The direct connection between wealth and operating expenses and total expenses is revealed by further statistics, a few of which bear mention here.

% tfc

“The consequences of [such] disparities are dramatic. * * * To achieve expenditure levels to provide better educational output, low-wealth districts must tax themselves at relatively high rates, as a result of which they encounter difficulties in obtaining school budget approvals, imposition of austerity budgets which limit transportation, supplies, library and textbook purchases, and, ultimately, rises in rates of mortgage foreclosure and community instability. [See, e.g., Matter of Onteora Cent. School Dist. (Onteora Non-Teaching Employees Assn.), 56 NY2d 769.]

%

“Low-wealth districts are unable to reduce class size and their children lose the resulting individual attention which is particularly important for both the disadvantaged and the gifted. Such districts are compelled to hire fewer non-teaching personnel as guidance counselors, psychologists and therapists and they cannot adequately provide the special attention requisite for students with severe speech and hearing impediments. Poor districts must ration their speech therapists and other ancillary services to such a degree that long waiting lists exist for these services. Also constrained by insufficient realty wealth are the offer of the number and variety of advanced placement programs (which encourage children to continue in school and provide better preparation for college) * * * Finally, the low-wealth districts experience chronic shortages of equipment and supplies.
* * *
*57 “Fund shortages also affect district ability to engage necessary teaching and administrative personnel. At the time of trial, 9 of Brentwood’s 12 elementary schools were without assistant principals and the district was unable to follow the Education Department’s recommendation for reducing class size in certain courses because it could not afford to hire the requisite additional staff. In Roosevelt, there were no funds for substitute teachers and 23 professional staff members had to be terminated in 1975-1976 to eliminate a budget deficit.” (83 AD2d, at pp 227-229.)
Surely, if it were meet to substitute the minimized reading the majority would give the education article for the hope and promise with which the constitutional delegates wrote it, it could not be said as a matter of law that the picture painted by this proof of disparities and discriminations complied with even the undefined “minimal acceptable facilities and services” or the broadly stated “sound basic education” to which it would be thus reduced. The fact is, of course, that in this past century, as high school and college statistics show, the acceptable level of education in our country has risen, not fallen.
Responsively, the constitutional demands of our State’s education article, must be deemed to have kept pace. For, while, as a practical matter, the Federal Constitution may be said to fix a floor for the rights of our people, the ceiling may be set by each State’s own constitutional charter (see, generally, my dissent in Matter of Esler v Walters, 56 NY2d 306, 315).[5] And, as great expounders of constitutional law, from Marshall to Holmes, have always made clear, such a document’s permanence rests on its adaptability to changing events (Jackson, Struggle for Judicial Supremacy, p 174).
This brings me to the unequal protection phase of this case for, as I see it, whether taken separately or in their combined effect, the guarantees of the two converging constitutional provisions here at stake preclude the unequal and inadequate public schooling which children in property poor or fiscally overburdened areas of this State must endure.
*58 On this score, suffice it to say that I am in agreement with the Appellate Division’s determination that, for reasons included among those on which I have already touched, the standard of scrutiny to be brought to bear on this case was the intermediate one heretofore recognized in this State (see Matter of Fay, 44 NY2d 137, app dsmd sub nom. Buck v Hunter, 439 US 1059; Matter of Lalli, 43 NY2d 65, affd sub nom. Lalli v Lalli, 439 US 259; Alevy v Downstate Med. Center of State of N. Y., 39 NY2d 326; Gunther, Supreme Court 1971 Term — Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv L Rev 1, 28, 35, 44-47).[6]
It then proceeded along an analytical path which included recognition (1) that equality of educational opportunity is an important State constitutional interest in New York (see, also, Plyler v Doe, 457 US 202, supra; Brown v Board of Educ., 347 US 483, 489), (2) that the extensive invidious disparities in the availability of this opportunity are born of the classifications based on property or fiscal wealth of the districts in which the affected children reside, (3) that preservation of local controls, the consideration the State (and now the majority here) offers for imposing the statutory plan, is so confined by what a limited local tax base will permit that its vaunted furtherance of local independence is illusory rather than real, and (4) that by *59 no means had the State shown that the local input it could achieve could not be created by less intrusive means. On these bases, it was decided, correctly I say, that the intermediate standard was an effective bar to the statutory scheme.
Finally, two related equal protection questions may be worthy of comment.
The first of these is that it is not to be assumed that the equal protection clause of the Federal Constitution was not also impinged. Although the Appellate Division, as an intermediate tribunal, thought it best to avoid the question, San Antonio School Dist. v Rodriguez (411 US 1) may leave more leeway than some believe. In Rodriguez, there was no claim that the statute malapportioned State school aid by mismeasuring the funding capacities and needs of city districts. Rather, the Supreme Court there expressly stated its concern lest the problems of the “overburdened core-city school districts” in that case be exacerbated rather than eased by recognition of the theory pressed by their plaintiffs.
The second bears on the analysis provisionally suggested in Justice Weinstein’s concurring opinion — that strict scrutiny may have been an appropriate test. This formulation was premised largely on the undisputed fact that the existing education aid formulae have an adverse effect, not only on pupils from impoverished families, but also on a large percentage of the nearly 750,000 “minority” students (black, Hispanic, American Indian, Asian and others). About 110,000 are unable to participate in school effectively in English and many are illiterate in their native tongues as well.
Raised, therefore, was the spectre of an issue of discrimination involving the approximately 83% of the “minority” people who reside in the intervenor cities. Its occasion would be the inability of these cities, left bereft of the means to do so, to cope with the social and educational breakdown affecting a large group identifiable by race, country of origin or alienage. This issue, of course, is made far less tenuous, if that it ever was, by last week’s Federal equal protection decision in Plyler v Doe (supra). Be that as *60 it may, however, since Justice Weinstein decided to adopt the alternative of joining in the majority’s rationale, which in this case would have achieved the same result, suffice it unto the day that the question needs no answer now.
In fine, poor children, no less than rich, and the Nation of which both are a part, are entitled to an education that prepares today’s students to face the world of today and tomorrow. Those who took and tolled the testimony tell us that, by any standard that counts, for the multitudinous many no such educational opportunity truly exists. Understandably, then, as the Governor put it to the Legislature just the other month, “Financial inequalities in education are more pronounced than at any time in the State’s history” and “There can be no disagreement that New York’s school finance program must be reformed”. Because, nevertheless, as the record reveals, our present method of financing education grossly distorts our ability to do so, and because I agree with the Appellate Division that it is constitutionally defective, my vote is to uphold the order of that court.
Chief Judge Cooke and Judges Jasen, Gabrielli, Wachtler and Meyer concur with Judge Jones; Judge Fuchsberg dissents and votes to affirm in a separate opinion.
Order modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.

. Justice Smith held that the equal protection clauses of both the Federal and State Constitutions were implicated as to the intervener cities. The Appellate Division, however, for its equal protection rationale, relied on the State Constitution alone.

. Then Governor Fenton too told the delegates, “Our people have acted upon the theory that the extension to every class and condition of society, of the means of early education, and facilities for the acquisition of knowledge in after life, contributes to the prevention of crime, the preservation of the social order, the security and stability of the government, and the thrift and prosperity of ail who are engaged in the various departments of industry”.

. The education clause, more matter-of-factly, but still tracking this more amplified language, reads: “The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated” (NY Const, art XI, § 1).

. Municipal overburden is a condition in which “ ‘[s]ome areas, particularly urban areas, have exceptionally high non-educational- expenses * * * [so that] revenues raised by property taxes which might otherwise be used for education, must be diverted to noneducational purposes’ ” (Robinson v Cahill, 69 NJ 449, 466, n 5). In the present case, the cities suffer from “high concentrations of the poor and elderly, large numbers of public assistance and public health recipients, high unemployment and low educational attainment, high crime rates, professional rather than volunteer fire departments, costly correctional facilities, mass transit problems, higher park and recreation expenses, subsidization of public housing, higher construction costs for new schools, deterioration of infrastructure, plus a myriad of other noneducational costs mandated by State law in connection with city employees * * *. The severity of the problems is illuminated by the fact that, with 43% of the State’s population, New York City had 70% of the State’s *54 public assistance recipients, who constituted 12%% of its residents as compared to 3.6% in the rest of the State. The city had 67% of the State’s Medicaid claimants and spent $51 per capita in contrast to $15 in the rest of the State” (83 AD2d, at pp 229-230). Ironically, though intended to redress the rural and property poor gap, the simplistically conceived “equalization” formulae are the cause of a perverse disequalization effect on education in the presumably property rich cities.

. As Judge Jon. 0. Newman of the United States Court of Appeals recently put it at a symposium bearing the descriptive title, “The Rediscovery of the Connecticut Consti *58 tution: Broadening Protections for Individual Rights”, “Within the grand design of the ‘old federalism’ there is room for a little chemistry to be practiced by state court judges construing the fundamental legal document of their state — the state constitution. Perhaps the discipline is more akin to alchemy, for it seems very likely that the leaden language of many state constitutional provisions is waiting to be turned into the pure gold of vital protections of individual rights”.

. Matter of Levy (38 NY2d 653), in which I joined, is to be distinguished from the present case. Levy involved no more than a dispute of very limited dimension in the course of which there was raised an issue over the rationality of a provision for “relieving the parents of blind and deaf children from any financial responsibility in connection with their children’s education while at the same time requiring parents whose children are otherwise handicapped to contribute to the maintenance component of educational expenses” (supra, at p 658). Largely on historical grounds, in the main because the plight of the blind and deaf became a societal concern before those otherwise handicapped, the court found a rational basis for the differentiation and declined to require a broadening of the maintenance program. In sharp contrast, what plaintiffs here — including a mass of disadvantaged children — primarily seek is nondiscriminatory distribution of the moneys the State already makes available. As already indicated, that it is most appropriate, and indeed urgent, for the courts to grant this relief by enforcing our Constitution has been the view of every New York Judge who has had occasion to pass on this case up to this point.